**Eric L. MILLER, Appellant,**

v.

**RAYTHEON AIRCRAFT COMPANY, Raytheon Travel Air, and Flight Options, L.L.C., Appellees.**

No. 01–05–00787–CV.

Court of Appeals of Texas, Houston (1st Dist.).

April 19, 2007.

---

1. Neither party is arguing that the provisions of the Texas Property Code are not applicable to this subdivision.

John Albert Sullivan III and Robert J. Filteau, Filteau & Sullivan, P.C., Houston, TX, for Appellant.

Charles B. Hampton and Timothy Scott McConn, Andrews & Kurth, L.L.P., Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices JENNINGS and BLAND.

### OPINION

JANE BLAND, Justice.

In this wrongful discharge case, Eric Miller, an airplane pilot, appeals summary judgments entered in favor of appellees Raytheon Aircraft Company (RAC), Raytheon Travel Air (RTA), and Flight Options, L.L.C. (FOC). Miller contends (1) summary judgment was improper on his

wrongful discharge claims under the *Sabine Pilot*[1] exception to the employment-at-will doctrine, and the trial court erred in considering hearsay in a summary judgment affidavit, (2) his wrongful discharge claims are not preempted by the Airline Deregulation Act of 1978,[2] (3) summary judgment on his breach of contract claims was improper because he was not an at-will employee, and (4) summary judgment was improper on his common law tort, conspiracy, and unpaid wages claims. We conclude that RAC and RTA established that they terminated Miller's employment for a reason other than his refusal to perform illegal acts, negating the causation required for a *Sabine Pilot* claim as a matter of law. We further conclude that the Airline Deregulation Act of 1978 preempts Miller's *Sabine Pilot* wrongful discharge claim against FOC. Finally, the trial court properly granted summary judgment on Miller's breach of contract and common law claims. We therefore affirm the trial court's orders granting summary judgment.

### Facts and Procedural History

RAC hired Miller in December 1997 and assigned him to work for RTA as a pilot. RTA was a fractional aircraft ownership business in which customers would buy a share of an aircraft and pay a monthly management fee. Buying a share of an aircraft entitled the customer to a certain number of flight hours per year. RTA managed the aircraft, which included providing pilots, crew, maintenance, fuel, catering, and scheduling services.

In December 2001, RTA formed a joint venture with Flight Options, Inc. (FOI), an RTA competitor. The venture established a new company called Flight Options, L.L.C. (FOC). FOC also engages in a fractional aircraft ownership business and operates RTA's former fleet of aircraft. RTA initially owned a forty-nine percent interest in FOC, but currently owns a greater than fifty percent interest. As part of the transaction, RTA ceased flight operations upon the effective date of the agreement.

Miller worked for RAC and RTA until the FOC joint venture commenced on April 1, 2002, whereupon Miller began working for FOC. On April 4, just four days after Miller began work, FOC fired Miller, providing as a basis for its decision that it had received complaints that he had been abusive to a female flight attendant, and that he had unnecessarily slowed down an equipment upgrade.

In this lawsuit, Miller alleges that he was fired for a different reason. According to Miller's affidavit, as a pilot, he was responsible for ensuring that any aircraft he was assigned to fly was fit for service in accordance with the RTA Flight Operations Manual and Federal Aviation Administration (FAA) regulations. Generally, FAA regulations require that all systems and components on an aircraft be operative. An aircraft, however, may nonetheless be dispatched for a flight, or may continue a flight, with certain systems and components inoperative, provided the aircraft has an approved Minimum Equipment List (MEL), and is operated in accordance with the procedures and limitations prescribed by the MEL. Miller alleges that throughout his employment at RAC and RTA, his superiors requested and pressured him to continue flight operations with aircraft that had maintenance problems that required their grounding in ac-

---

**1.** *Sabine Pilot Serv., Inc. v. Hauck,* 687 S.W.2d 733, 735 (Tex.1985).

**2.** 49 U.S.C. § 41713(b)(1) (2000).

cordance with their published MELs. Miller further alleges that he was fired because he refused to fly these aircraft, citing five occasions when he grounded aircraft that did not meet MEL standards.

In addition to a *Sabine Pilot* wrongful discharge claim, Miller seeks recovery for breach of employment contract, promissory estoppel, fraud, negligent misrepresentation, civil conspiracy, intentional infliction of emotional distress, negligence, and wage and hour violations.

### Wrongful Discharge—RAC and RTA

#### A. Affidavit of William Wallisch

At the outset, Miller contends the trial court abused its discretion in denying his motion to strike the affidavit of William Wallisch, an RTA Vice President, in its entirety. The trial court struck the portion of Wallisch's affidavit that stated that Miller's employment with RTA was "at-will," but refused to strike the remainder of the affidavit. Miller contends that the affidavit fails to demonstrate that Wallisch is competent to offer testimony concerning Miller's employment status. Miller also contends that Wallisch's statement in the affidavit referencing an un-appended combination agreement constitutes hearsay. Miller directs us to Texas Rule of Civil Procedure 166a(f), which provides: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." TEX.R. CIV. P. 166a(f).

We review a trial court's decision to admit or exclude summary judgment evidence for an abuse of discretion. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998); *United Blood Servs. v. Longoria*, 938 S.W.2d 29, 30 (Tex. 1997). The standards for the admissibility of evidence in a summary judgment proceeding are the same as those applicable to a regular trial. *Longoria*, 938 S.W.2d at 30. In an abuse of discretion review, we consider whether the trial court acted arbitrarily or unreasonably, or without reference to guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). To warrant a reversal, the trial court's error must have probably caused rendition of an improper judgment. TEX.R.APP. P. 44.1(a)(1).

#### 1. Competence

■ Miller contends Wallisch's affidavit failed to demonstrate that he was competent to offer testimony concerning Miller's employment status. Wallisch's affidavit states:

> 1. My name is William Wallisch. I am over twenty-one years of age, and I am competent to make this Affidavit. All matters stated herein are true and correct and within my personal knowledge.
>
> 2. I am currently the Vice President and Controller for Raytheon Aircraft Parts & Inventory Distribution. From April 1997 through August 2002, I served as the Vice President, Finance of Raytheon Travel Air Company.

Rule 166a(f) requires an affiant to affirmatively show that he is competent to testify to the matters stated in an affidavit. TEX.R. CIV. P. 166a(f). The affidavit must affirmatively demonstrate how the affiant is competent to testify. *Jackson T. Fulgham Co. v. Stewart Title Guar. Co.*, 649 S.W.2d 128, 130 (Tex.App.-Dallas 1983, writ ref'd n.r.e.). "The personal knowledge requirement is satisfied if the affidavit sufficiently describes the relationship between the affiant and the case so that it may be reasonably assumed that the affiant has personal knowledge of the facts

stated in the affidavit." *Stucki v. Noble,* 963 S.W.2d 776, 780 (Tex.App.-San Antonio 1998, pet. denied).

Here, the assertion in Wallisch's affidavit that he was Vice President of Finance at RTA from 1997 until 2002 demonstrates a basis for personal knowledge concerning Miller's employment status. We have held that such an assertion is sufficient to demonstrate personal knowledge and competence to testify. *See Waite v. BancTexas–Houston, N.A.,* 792 S.W.2d 538, 540–41 (Tex.App.-Houston [1st Dist.] 1990, no writ); *see also Equisource Realty Corp. v. Crown Life Ins. Co.,* 854 S.W.2d 691, 695 (Tex.App.-Dallas 1993, no writ); *Jackson T. Fulgham Co.,* 649 S.W.2d at 130. Accordingly, we hold that the factual assertions in Wallisch's affidavit demonstrate his competence to testify about Miller's employment status at RTA.

### 2. Hearsay

■ Miller also contends that Wallisch's statement in the affidavit referring to the combination agreement creating FOC constitutes hearsay. Specifically, Miller objects to the portion of Wallisch's affidavit that states, "although, pursuant to the parties' agreements, the pilots would be under the operational control of Flight Options, L.L.C. between March 20, 2002 and April 1, 2002." RAC and RTA respond that the statement regarding the terms of the agreement constitutes a statement of operative facts, and is therefore not hearsay.

To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was erroneous and that the error was calculated to cause, and probably did cause, "rendition of an improper judgment." Tex.R.App. P. 44.1(a)(1); *Malone,* 972 S.W.2d at 43; *Benavides v. Cushman, Inc.,* 189 S.W.3d 875, 879 (Tex. App.-Houston [1st Dist.] 2006, no pet.). In making this determination, we review the entire record. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 754 (Tex.1995). Reversible error does not usually occur in connection with evidentiary rulings unless the appellant can demonstrate that the whole case turns on the particular evidence admitted or excluded. *Id.* at 753–54; *Benavides,* 189 S.W.3d at 879; *GT & MC, Inc. v. Tex. City Ref., Inc.,* 822 S.W.2d 252, 257 (Tex.App.-Houston [1st Dist.] 1991, writ denied).

Here, Miller included a copy of the combination agreement in his summary judgment evidence. Given that the agreement was present in the record, we hold that Miller could not be harmed by error, if any, in the trial court's admission of the statement in Wallisch's affidavit. *See* Tex.R.App. P. 44.1(a)(1); *GTE Sw., Inc. v. Bruce,* 998 S.W.2d 605, 619–20 (Tex.1999) (holding that trial court's error in admitting expert testimony as to whether defendant's conduct was extreme and outrageous was harmless because expert testimony was cumulative of abundant evidence at trial showing that his conduct was extreme and outrageous); *Fairmont Supply Co. v. Hooks Indus., Inc.,* 177 S.W.3d 529, 532 (Tex.App.-Houston [1st Dist.] 2005, pet. denied) (holding that any error in admission of evidence was harmless because it was cumulative).

### B. Wrongful Discharge

■ Miller contends the trial court erred in granting RAC and RTA's traditional motion for summary judgment on his wrongful discharge claims because RAC and RTA did not establish as a matter of law that Miller was terminated for reasons other than his refusal to fly aircraft in violation of FAA regulations.

We review a summary judgment de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005); *Provident Life & Accident Ins. Co. v. Knott,* 128

S.W.3d 211, 215 (Tex.2003). Under the traditional standard for summary judgment, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant a judgment as a matter of law. Tex.R. Civ. P. 166a(c); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). In our review, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Dorsett*, 164 S.W.3d at 661.

 In Texas, absent a specific agreement to the contrary, an employer may fire an employee at will for good cause, bad cause, or no cause at all. *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex.1998). In *Sabine Pilot Service, Inc. v. Hauck*, the Texas Supreme Court recognized an exception to the employment-at-will doctrine for an employee discharged "for the sole reason that the employee refused to perform an illegal act." 687 S.W.2d 733, 735 (Tex.1985); *see also Winters v. Houston Chronicle Publ'g Co.*, 795 S.W.2d 723, 724 (Tex.1990). The court held that a plaintiff has the burden to prove by a preponderance of the evidence that his discharge was for the sole reason that he refused to perform an illegal act that he reasonably believed would subject him to criminal penalties. *Sabine Pilot*, 687 S.W.2d at 735; *see also City of Midland v. O'Bryant*, 18 S.W.3d 209, 215 (Tex.2000); *Winters*, 795 S.W.2d at 724. The *Sabine Pilot* exception applies when an employee has been unacceptably forced to choose between risking criminal liability or being discharged from his livelihood. *See Winters*, 795 S.W.2d at 724. An employer who discharges an employee both for refusing to perform an illegal act and for a legitimate reason cannot be liable for wrongful discharge—the refusal must be the sole cause for the employee's termination. *Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 633 (Tex.1995); *McClellan v. Ritz–Carlton Hotel Co.*, 961 S.W.2d 463, 464 (Tex.App.-Houston [1st Dist.] 1997, no pet.).

The evidence is undisputed that RAC and RTA terminated each and every one of their 500 pilots when RTA ceased its operation of the fractional aircraft ownership business. The master transaction agreement creating FOC provides:

> 4.5 *Employees.* Prior to the Closing Date, the Parties will identify the employees of [FOI] and [RTA] that are to be offered employment with [FOC] as of the Closing Date and shall make a formal offer of employment to each such Person and shall inform each such Person of the compensation and benefits for which such Person will be eligible as an employee of [FOC].

In his affidavit, William Wallisch states,

> 4. On March 20, 2002, Travel Air combined certain of its assets and liabilities with certain assets and liabilities *of its* competitor Flight Options, Inc., in order to form a separate legal entity, Flight Options, L.L.C.
>
> 5. Although Travel Air did not cease to exist as a result of this transaction, it ceased its operation of fractionally-owned aircraft. As a result, the services rendered by the pilots who were employed by Travel Air were no longer necessary, and the employment of Travel Air pilots was officially terminated on or about April 1, 2002 (although, pursuant to the parties' agreements, the pilots would be under the operational control of Flight Options, L.L.C. between March 20, 2002 and April 1, 2002).

Miller accepted an offer of employment from FOC in February of 2002. RAC executed a termination of employment form on April 2, 2002 that states that

Miller's employment was voluntarily terminated because he obtained another job due to the "[m]erger of Raytheon Travel Air and Flight Options."

This evidence establishes as a matter of law that RAC and RTA terminated the employment of all their pilots, including Miller, because of the creation of FOC and the cessation of RTA's fractional aircraft ownership business. *See Bell v. Specialty Packaging Prods.*, 925 F.Supp. 475, 477 (W.D.Tex.1994) (holding that because reduction in work force at her plant was at least one reason for plaintiff's termination, her *Sabine Pilot* claim failed); *cf. McClellan*, 961 S.W.2d at 464–65 (holding defendant failed to prove as matter of law at least one legitimate reason for terminating plaintiff's employment). An employer who discharges an employee for reasons other than the refusal to perform an illegal act cannot be liable for wrongful discharge under *Sabine Pilot*. *See Hinds*, 904 S.W.2d at 633; *McClellan*, 961 S.W.2d at 464. The trial court therefore properly granted RAC and RTA's summary judgment on Miller's *Sabine Pilot* claims.

### Preemption

In his second issue, Miller contends the trial court erred in granting FOC's summary judgment on his *Sabine Pilot* wrongful discharge claim because the claim is not preempted by the Airline Deregulation Act of 1978(ADA).[3]

#### A. General Preemption Law

■ Federal preemption of state law is grounded in the Supremacy Clause of the United States Constitution, which provides that "the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2; *Delta Air Lines, Inc. v. Black*, 116 S.W.3d 745, 748 (Tex.2003). Under the Supremacy Clause, if a state law conflicts with federal law, the state law is preempted and will have no effect. *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981); *Black*, 116 S.W.3d at 748.

■ "Preemption can take one of several forms." *Black*, 116 S.W.3d at 748. A federal law may expressly preempt a state law. *Id.; Great Dane Trailers, Inc. v. Estate of Wells*, 52 S.W.3d 737, 743 (Tex. 2001). A federal law may also preempt a state law impliedly, "either (i) when the scheme of federal regulation is sufficiently comprehensive to support a reasonable inference that Congress left no room for supplementary state regulation or (ii) if the state law actually conflicts with federal regulations." *Black*, 116 S.W.3d at 748; *Great Dane Trailers*, 52 S.W.3d at 743. A state law presents an actual conflict when a party cannot comply with both state and federal regulations, or when the state law would obstruct Congress' purposes and objectives. *Black*, 116 S.W.3d at 748; *Great Dane Trailers*, 52 S.W.3d at 743.

■ The purpose of Congress is the ultimate touchstone in every preemption case. *Retail Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 222–23, 11 L.Ed.2d 179 (1963); *Black*, 116 S.W.3d at 748. We discern congressional intent primarily from the statute's language and structure. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486, 116 S.Ct. 2240,

---

**3.** FOC also maintains that the trial court's summary judgment properly disposed of Miller's wrongful discharge claim because he was fired for reasons other than his refusal to perform an illegal act, and any action that FOC requested him to take would not have resulted in criminal penalties. As we agree with FOC's preemption argument, we do not address the other potential grounds for the trial court's summary judgment.

2250–51, 135 L.Ed.2d 700 (1996); *Black*, 116 S.W.3d at 748. Also relevant is the purpose of the statute as a whole, which is revealed through "the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Lohr*, 518 U.S. at 486, 116 S.Ct. at 2251; *Black*, 116 S.W.3d at 748–49.

*B. Airline Deregulation Act*

In 1978, Congress deregulated the airline industry by enacting the ADA. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378, 112 S.Ct. 2031, 2034, 119 L.Ed.2d 157 (1992); *Black*, 116 S.W.3d at 749. The ADA is designed to promote "maximum reliance on competitive market forces," while at the same time "assigning and maintaining safety as the highest priority in air commerce." 49 U.S.C. § 40101(a) (2000); *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 230, 115 S.Ct. 817, 824, 130 L.Ed.2d 715 (1995). To ensure that the states would not compromise federal deregulation by promulgating regulations of their own, the ADA contains a preemption provision. 49 U.S.C. § 41713(b)(1) (2000); *Morales*, 504 U.S. at 378–79, 112 S.Ct. at 2034. The ADA's preemption provision provides:

> Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1).

*1.* Morales *and* Wolens

In *Morales v. Trans World Airlines, Inc.*, the United State Supreme Court examined whether the ADA preempted the enforcement of guidelines concerning regulation of airline fare advertising through Texas's consumer protection statutes. 504 U.S. at 378–80, 112 S.Ct. at 2034–35. Relying on its ERISA line of cases and the ordinary meaning of the words of the statute, the Court construed the phrase "related to" broadly to preempt state enforcement actions "having a connection with or reference to" airline rates, routes, or services. *Id.* at 384, 112 S.Ct. at 2037. The Court also held that the preemption provision could apply to laws of general applicability that do not specifically reference the airline industry. *Id.* at 386, 112 S.Ct. at 2038. While the Court acknowledged that some state actions might affect airline fares in too tenuous, remote, or peripheral a manner to be preempted, it concluded that the obligations imposed by the advertising guidelines would affect the airlines' ability to market their product and the fares they charged. *Id.* at 390, 112 S.Ct. at 2040. The advertising guidelines therefore had a "forbidden significant effect" on the airlines' rates, routes, and services because they restricted fare advertising, which relates to rates. *Id.* at 388–89, 112 S.Ct. at 2039. The Court held the ADA preempted the fare advertising guidelines in the state consumer protection statutes at issue. *Id.* at 391, 112 S.Ct. at 2041.

In *American Airlines, Inc. v. Wolens*, the United States Supreme Court again addressed the ADA's preemption clause. 513 U.S. at 227–28, 115 S.Ct. at 823–24. *Wolens* involved state law consumer fraud and breach of contract claims arising from retroactive changes in an airline's frequent flyer program. *Id.* at 224–25, 115 S.Ct. at 822. The Court focused on the preemption clause phrase, "enact or enforce any law," to determine the ADA's preemptive scope. *Id.* at 226, 228–29, 115 S.Ct. at 823–24. The Court held that, like the guidelines at issue in *Morales*, the ADA

preempted Illinois's consumer fraud statute because the statute "serve[d] as a means to guide and police the marketing practices of the airlines." *Id.* at 228, 115 S.Ct. at 823–24.

The *Wolens* Court next turned to whether the ADA preempted the plaintiffs' breach of contract claims. *Id.* at 228, 115 S.Ct. at 824. The Court held that the ADA's preemption clause did not shield airlines from "suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." *Id.* The Court reasoned that the contract at issue was a privately ordered obligation, and did not amount to a state's enactment or enforcement of a state law, rule, regulation, standard, or other provision. *Id.* at 228–29, 115 S.Ct. at 824; *see also* 49 U.S.C. § 41713(b)(1). The Court limited its holding, however, to suits based on the terms of the parties' bargain, "with no enlargement or enhancement based on state laws or policies external to the agreement." *Id.* at 233, 115 S.Ct. at 826. Courts have interpreted this to mean that if a court cannot adjudicate a contract claim without resort to external law, the ADA preempts the claim. *See, e.g., Smith v. Comair, Inc.,* 134 F.3d 254, 257 (4th Cir.1998); *Black,* 116 S.W.3d at 750; *Boon Ins. Agency, Inc. v. Am. Airlines, Inc.,* 17 S.W.3d 52, 58–59 (Tex.App.-Austin 2000, pet. denied). Additionally, the *Wolens* Court suggested that the ADA's preemption provision should be read in light of the ADA's overarching deregulatory purpose, and should be interpreted to mean that states may not seek to impose their own public policies or theories of competition or regulation on the operations of an air car-

rier. *See* 513 U.S. at 229 n. 5, 115 S.Ct. at 824 n. 5.

### 2. Kiefer *and* Black

The Texas Supreme Court first addressed preemption under the ADA in *Continental Airlines, Inc. v. Kiefer.* 920 S.W.2d 274, 275 (Tex.1996). The court applied a two-part analysis to determine whether the ADA preempted the plaintiffs' personal injury negligence claims.[4] *Id.* at 281–82. First, the court examined whether the claims related to airline rates, routes, or services. *Id.* at 281. Second, the court examined whether the claims constituted the enactment or enforcement of a state law, rule, regulation, standard, or other provision. *Id.* The court concluded that, although the plaintiffs' negligence claims clearly related to the airline's services, the claims did not amount to the enforcement of a state law and therefore were not preempted. *Id.* at 282. The court noted that, unlike the state consumer protection legislation at issue in *Morales,* negligence actions do not "carry the same 'potential for intrusive regulation of airline business practices ....'" *Id.* (quoting *Wolens,* 513 U.S. at 227, 115 S.Ct. at 823). The court, however, cautioned that, depending on the nature and extent of damages sought, even simple negligence actions may constitute an impermissible regulation of the airline industry through state tort law. *Id.* In making its decision, the court focused on the extent to which the negligence claims threatened to encroach on the congressional objective of airline deregulation, instead of categorically declaring that the ADA always exempts personal injury claims from preemption. *Id.; see also Black,* 116 S.W.3d at 751.

---

4. The Texas Supreme Court consolidated two negligence cases for the *Kiefer* opinion. *Cont'l Airlines, Inc. v. Kiefer,* 920 S.W.2d 274, 275 (Tex.1996). In the first case, a passenger was injured when a briefcase fell from an overhead storage bin and struck her on the head. *Id.* In the second case, the plaintiff claimed he was injured by the airline's negligent failure to provide meet and assist services. *Id.* at 275–76.

In 2003, The Texas Supreme Court again addressed preemption under the ADA in *Delta Air Lines, Inc. v. Black.* 116 S.W.3d at 747. In *Black,* the plaintiff and his spouse purchased first-class seats on a Delta flight for a trip to Las Vegas. *Id.* When the couple arrived at the airport, Delta denied the spouse a first-class seat because the flight was overbooked. *Id.* The plaintiff then sued Delta for breach of contract, fraud, and negligent misrepresentation. *Id.* at 748. Delta asserted that the ADA preempted the plaintiff's claims. *Id.*

The Texas Supreme Court applied the two-part analysis from *Kiefer* and examined whether the plaintiff's contract claims related to airline prices, routes, or services, and whether the claims constituted the enactment or enforcement of a state law, regulation, or other provision. *Id.* at 752–54. The court also examined cases from the Ninth and Fifth Circuits to determine the meaning of the term "services" in the ADA's preemption clause. *Id.* at 752; *see also Charas v. Trans World Airlines, Inc.,* 160 F.3d 1259, 1261 (9th Cir.1998) (narrowly defining services as "the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail"); *Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 336 (5th Cir. 1995) (broadly defining services to include "ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself"). While the court did not articulate its own definition of services, it concluded that claims involving boarding and seating procedures fall within most courts' definitions of services, including the Ninth and Fifth Circuits'. *Black,* 116 S.W.3d at 753. The court therefore held that the plaintiff's contract claims related to Delta's services. *Id.; see also Wolens,* 513 U.S. at 226, 115 S.Ct. at 823 (noting that services includes "access to flights and class-of-service up-grades"). The court stated that, unlike the frequent flyer program in *Wolens,* "seating policies and boarding procedures are not peripheral to the operation of an airline, but are inextricably linked to the contract of carriage between a passenger and the airline and have a definite 'connection with, or reference to' airline services." *Black,* 116 S.W.3d at 753 (quoting *Morales,* 504 U.S. at 384, 112 S.Ct. at 2037).

The court also concluded that the plaintiff's contract claims, if allowed to proceed, would constitute state enforcement or enactment of a state law under the preemption provision of the ADA. *See id.* at 756. The court discussed the fact that the alleged contractual violations in the case involved a common condition unique to the airline industry—the failure to seat an allegedly confirmed ticket holder because of overbooking—and that unlike the frequent flyer agreements at issue in *Wolens,* specific federal regulations govern compensation for air passengers who are involuntarily prevented from boarding a flight due to overbooking. *Id.; see also* 14 C.F.R. §§ 250.1–250.9 (2000) (requiring airlines to pay compensation to any passenger who is involuntarily denied boarding caused by oversold flight, and allowing passenger to decline payment and recover damages in court of law, unless passenger is offered accommodations or is seated in section of aircraft other than that specified on ticket at no extra charge). Delta had incorporated these federal regulations into its contract. Under the federal regulations, the plaintiff would not have been entitled to sue Delta for breach of contract because the plaintiff and his spouse were not involuntarily denied boarding—Delta offered to seat them "in a section of the aircraft other than that specified on the ticket at no extra charge . . . ." *Black,* 116 S.W.3d at 755–56; *see also* 14 C.F.R. § 250.6(c). The court noted that the specific federal

regulations had a national purpose in that they provided a uniform system of compensation to passengers. *Black,* 116 S.W.3d at 756. The court stated that, "[i]f passengers were permitted to challenge airlines' boarding procedures under state common law, the airline industry would potentially be subject to regulation by fifty different states." *Id.* The court held that the ADA preempted the plaintiff's contract claims because the court could only adjudicate the claims by reference to laws and policies external to the contract. *Id.*

### C. Air Carrier Status

■■■ Miller contends the ADA does not apply to this case because FOC did not establish as a matter of law that it is an "air carrier," as defined by the ADA. 49 U.S.C. § 40102(a)(2) (2000).

The ADA's preemption provision applies only to laws or regulations that affect air carriers. *Id.* § 41713(b)(1). Under the ADA, "air carrier" is defined as "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation." *Id.* § 40102(a)(2). "[A]ir transportation" means "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft." *Id.* § 40102(a)(5). "[I]nterstate air transportation" means "the transportation of passengers or property by aircraft as a common carrier for compensation. . . ." *Id.* § 40102(a)(25). A "citizen of the United States" can be "a corporation or association organized under the laws of the United States or a State, the District of Columbia, or a territory or possession of the

United States. . . ." *Id.* § 40102(a)(15)(C) (Supp. III 2003).

FOC produced a certificate from the FAA certifying its status as an air carrier. *See* 14 C.F.R. § 119.5(a) (2000) ("A person authorized by the Administrator to conduct operations as a direct air carrier will be issued an Air Carrier Certificate."). Miller did not produce any contrary evidence to raise a fact issue. FOC has therefore established as a matter of law its status as an air carrier under the ADA.[5]

### D. ADA Preemption of Miller's Sabine Pilot *Claim*

■■■ In determining whether the ADA preempts Miller's *Sabine Pilot* claim against FOC, we apply the Texas Supreme Court's two-part analysis from *Kiefer.* *Kiefer,* 920 S.W.2d at 281–82.

We begin with the question of whether Miller's *Sabine Pilot* wrongful discharge claim is related to FOC's prices, routes, or services. *See id.* at 281. Miller's *Sabine Pilot* claim authorizes a suit for wrongful discharge when FOC terminated his employment allegedly for refusing to fly aircraft that did not meet FAA regulations. *See* 687 S.W.2d at 735. It is undisputed that Miller's refusals to pilot aircraft resulted in the grounding of the aircraft. Grounding aircraft directly affected FOC's point-to-point transportation services. While some variation has arisen among the courts regarding the definition of the term "services" under the ADA, every court attempting to define the term has included point-to-point transportation within its def-

---

**5.** Miller contends FOC's certificate was not properly before the trial court because it was not attached to FOC's supplemental motion for summary judgment. FOC produced the certificate for the first time in its reply to Miller's response to the supplemental motion for summary judgment. Miller did not move to strike this evidence and the trial court noted that it considered the "pleadings on

file" in its summary judgment order. As the Texas Supreme Court has explained, the trial court's ruling on a summary judgment is based upon the "issues raised in the motion, response, and any subsequent replies." *Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993). The certificate was therefore properly before the trial court.

inition as a bargained-for aspect of air travel. *See Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1257 (11th Cir.2003) (adopting Fifth Circuit definition of services, which includes transportation itself); *Botz v. Omni Air Int'l*, 286 F.3d 488, 495 (8th Cir.2002) (holding flight attendant's refusal to violate federal law by exceeding work hour maximum affected air carrier's services because aircraft could not fly without her); *Duncan v. NW. Airlines, Inc.*, 208 F.3d 1112, 1114–15 (9th Cir.2000) (holding that service refers to provision of air transportation to and from various markets at various times), *cert. denied*, 531 U.S. 1058, 1058, 121 S.Ct. 650, 650–51, 148 L.Ed.2d 571 (2000) (O'Connor, J., dissenting) (noting various definitions of term "services" under ADA and need to resolve this conflict between circuit courts); *Charas*, 160 F.3d at 1261 (defining services to include point-to-point transportation of passengers, cargo, or mail); *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1433 (7th Cir.1996) (defining services to include transportation itself); *Hodges*, 44 F.3d at 336 (defining services to include transportation itself); *Black*, 116 S.W.3d at 752 (citing service definitions from *Hodges* and *Charas* ). Given the United States Supreme Court's broad interpretation of the phrase "related to," we hold that Miller's *Sabine Pilot* claim relates to FOC's point-to-point transportation services. *See* 49 U.S.C. § 41713(b)(1); *Morales*, 504 U.S. at 384, 112 S.Ct. at 2037 (defining phrase "related to" broadly to preempt state enforcement actions having connection with or reference to airline rates, routes, or services).

The second inquiry under the *Kiefer* analysis is whether Miller's *Sabine Pilot* wrongful discharge claim constitutes the enforcement of a state law, regulation, or other provision within the meaning of the ADA's preemption clause. *See Kiefer,* 920 S.W.2d at 281. Unlike a simple negligence claim, or a contract claim involving only obligations voluntarily undertaken by an air carrier, a *Sabine Pilot* wrongful discharge claim embodies state public policy. *See Wolens*, 513 U.S. at 232–33, 115 S.Ct. at 826; *Kiefer,* 920 S.W.2d at 282. A *Sabine Pilot* claim represents a policy determination by the State of Texas that an employee terminated for refusing to perform a criminal act should have a tort action against his employer. *See* 687 S.W.2d at 735 ("We now hold that public policy, as expressed in the laws of this state and the United States which carry criminal penalties, requires a very narrow exception to the employment-at-will doctrine announced in *East Line & R.R.R. Co. v. Scott.*"). Under the facts of this case, *Sabine Pilot* would allow Miller to seek money damages in state court when he chose to ground aircraft and suffered termination of his employment as a consequence. State enforcement of Miller's *Sabine Pilot* claim therefore imposes state policies on the point-to-point transportation services of FOC. *See Black*, 116 S.W.3d at 757. "A state's common law cannot operate against an airline in this context when it would constitute state enforcement of a law relating to airline services." *Id.; see also Morales*, 504 U.S. at 383–84, 112 S.Ct. at 2037. Contrary to the ADA's purpose, Miller's *Sabine Pilot* claim has the potential to impose state regulation on FOC's business practices and transportation services. *See Wolens*, 513 U.S. at 227–28, 115 S.Ct. at 823; *Black*, 116 S.W.3d at 754; *Kiefer,* 920 S.W.2d at 282. This is true despite the fact that the ADA and the *Sabine Pilot* claim alleged here have consistent goals: compliance with federal regulations and airline safety. The ADA's preemption provision displaces all state laws that fall within its sphere, regardless of whether the state law is consistent or inconsistent with the ADA's pur-

poses and objectives. *Morales*, 504 U.S. at 386–87, 112 S.Ct. at 2038. Accordingly, we hold that the ADA preempts Miller's *Sabine Pilot* claim because the claim relates to the transportation services FOC provides, and if allowed, would amount to the enactment or enforcement of a state law.[6]

The Eighth Circuit's decision in *Botz v. Omni Air International* supports our decision in this case. 286 F.3d at 495. In *Botz*, Omni Air International terminated Anna Botz's employment as a flight attendant after she refused a flight assignment that she believed violated federal safety regulations. *Id.* at 489. Botz sued Omni under a Minnesota whistleblower statute. *Id.* Omni asserted that the ADA preempted Botz's claim because the claim was related to Omni's point-to-point transportation services. *Id.* at 490, 492. The court agreed, reasoning that Botz's whistleblower claim allowed her to refuse assignments without fear of retaliation. *Id.* at 494. Refusal of an assignment could potentially disrupt Omni's transportation services because federal law requires a certain number of flight attendants on each flight. *See id.*

The Eleventh Circuit's decision in *Branche v. Airtran Airways, Inc.* uses a similar analysis but applies it to different facts. 342 F.3d at 1252. In *Branche,* Airtran Airways terminated Michael Branche's employment as a safety inspector after he reported Airtran's violations of federal law to the FAA. *Id.* Branche sued Airtran under a Florida whistleblower statute. *Id.* Airtran asserted that the ADA preempted Branche's claim because the claim was related to Airtran's services. *Id.* The court adopted the Fifth Circuit's definition of services from *Hodges v. Delta Airlines, Inc.,* and held that only air carrier services having a connection with or reference to the elements of air travel that are bargained for by passengers are preempted by the ADA. *Id.* at 1257–58; *Hodges,* 44 F.3d at 336 ("Elements of the air carrier service bargain include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself."). Branche's claim did not relate to Airtran's services. *Branche,* 342 F.3d at 1257. The court stated, "[a]lthough some safety-related claims may be tied to air carrier services, the very fact that they concern safety, standing alone, is insufficient to demonstrate this nexus." *Id.* at 1260. In discussing *Botz,* the court stated:

---

**6.** Additionally, we note that Congress amended the ADA in the year 2000 and added a provision creating a federal whistleblower cause of action for employees discharged or discriminated against for reporting an employer's violations of federal law. 49 U.S.C. § 42121 (2000). This whistleblower cause of action provides a uniform system of recourse for employees discharged or discriminated against for reporting their employers' violations of federal law. *Id.* While we recognize that Miller was not a whistleblower in this case, he had an available remedy if FOC had terminated him for reporting a violation of federal law. *See id.* The fact that federal law expressly addresses whistleblower claims against air carriers strengthens our conclusion that the ADA preempts Miller's *Sabine Pilot* wrongful discharge claim arising from his refusal to fly aircraft in violation of federal

law. *Compare Delta Air Lines, Inc. v. Black,* 116 S.W.3d 745, 756 (Tex.2003) (finding preemption of contract claim where FAA had created regulations to resolve dispute involved in plaintiff's breach of contract claim), *with Kiefer,* 920 S.W.2d at 281 (finding no preemption of common law negligence claims when Congress and FAA had created no method to resolve disputes involving negligence); *see also Botz v. Omni Air Int'l,* 286 F.3d 488, 496 (8th Cir.2002) (noting that whistleblower statute evidences Congress's intent to preempt state law whistleblower claims related to air safety); *but see Branche v. Airtran Airways, Inc.,* 342 F.3d 1248, 1260 (11th Cir.2003) (holding safety inspector's state law whistleblower claim was not preempted by ADA because claim was not related to air carrier services).

As for the connection between retaliatory discharge claims and airline services, we do not dispute the Eight Circuit's conclusion that the grounding of an airplane is related to airline services, in particular, the transport of passengers from one place to another. However, in this case, the connection—or, indeed, the potential connection—between Branche's actions and air carrier services is far more attenuated than in *Botz*. As the Eighth Circuit said, if a flight attendant refuses to fly and a replacement cannot be found, FAA regulations prevent the plane from leaving the gate, thereby disrupting service. Here, by contrast, we are not concerned with the withdrawal of clearance for a plane to take off based on mechanical concerns, but instead only with Branche's *post hoc* reporting of a FAA violation.... Had Branche claimed that Airtran fired him in retaliation for refusing to allow a plane to take off due to safety concerns, this would present a situation closer to the one at issue in *Botz*. But that is not the claim before us.

*Id.* at 1262–63.

Factually, our case is closer to *Botz* than it is to *Branche. Id.; Botz*, 286 F.3d at 494–95. Miller's *Sabine Pilot* claim is preempted because he alleges that he refused to pilot aircraft and was fired for it, and the *Sabine Pilot* claim subjects his employer to state law liability for firing a pilot for his refusal to fly. Unlike a post hoc report of a violation as in *Branche,* or a refusal to perform an illegal act unrelated to actual air flight, Miller's claim directly impinges on the provision of air carrier services. *See Sabine Pilot*, 687 S.W.2d at 735. We therefore hold that the trial court properly granted FOC's summary judgment on Miller's *Sabine Pilot* wrongful discharge claim.

We note the limited applicability of our holding. The ADA would not preempt a *Sabine Pilot* claim against an air carrier that is not related to the air carrier's prices, routes, or services. *See* 49 U.S.C. § 41713(b)(1).

## Contract Claims

In his fourth issue, Miller contends the trial court erred in granting summary judgment on his breach of contract claims. RAC and RTA attacked the breach of contract claims with a no-evidence motion for summary judgment, while FOC filed a traditional motion for summary judgment.

*A. RAC and RTA's Summary Judgment*

■■■■■ In their no-evidence motion for summary judgment, RAC and RTA contended that Miller produced no evidence that an employment contract existed. A contract that alters the at-will employment relationship must "unequivocally indicate [the employer's] definite intent to be bound not to terminate the employee except under clearly specified circumstances." *Brown*, 965 S.W.2d at 502; *see also Midland Judicial Dist. Cmty. Supervision & Corr. Dep't v. Jones*, 92 S.W.3d 486, 487 (Tex.2002).

In a Rule 166a(i) no-evidence summary judgment, the movant represents that no evidence exists as to one or more essential elements of the non-movant's claims, upon which the non-movant would have the burden of proof at trial. Tex.R. Civ. P. 166a(i). The non-movant then must present evidence raising a genuine issue of material fact on the challenged elements. *Id.* A no-evidence summary judgment is essentially a pre-trial directed verdict. *Bendigo v. City of Houston,* 178 S.W.3d 112, 113–14 (Tex.App.-Houston [1st Dist.] 2005, no pet.); *Jackson v. Fiesta Mart, Inc.,* 979 S.W.2d 68, 70–71 (Tex.App.-Austin 1998, no pet.). On review, we ascertain whether the non-movant produced more

than a scintilla of probative evidence to raise a genuine issue of material fact. *Jackson*, 979 S.W.2d at 70–71. More than a scintilla of evidence exists if the evidence " 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.' " *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003) (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997)). If the evidence does no more than create a mere surmise or suspicion of fact, less than a scintilla of evidence exists. *Chapman*, 118 S.W.3d at 751. To defeat a no-evidence motion for summary judgment, the respondent is not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements. Tex.R. Civ. P. 166a(i) cmt.

Miller received a letter from RAC in November of 1997 offering him employment as a pilot. Miller accepted the offer by signing the last page of the letter, as requested by RAC. Miller asserts that as a government contractor, RAC promised that it would employ Vietnam veterans and advance them in employment. *See* 38 U.S.C. § 4212(a)(1) (Supp. III 2003). Miller indicated on his RAC employment application that he wanted to participate in the Vietnam veterans' affirmative action program. The RAC employment application states:

> Raytheon Aircraft Company is a government contractor subject to Section 503 of the Rehabilitation Act of 1973 and Section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974. These acts require this company to take action to employ and advance in employment, in accordance with its policies, qualified handicapped/disabled individuals, disabled veterans and veterans of the Vietnam era. If you have such a handicap/disability, or you are a disabled veteran and would like to be considered

under the Affirmative Action Program, please complete the information requested below.

Miller also executed an employee assignment agreement and an employee confidentiality agreement at the request of RAC. In the assignment agreement, Miller gives RAC permission to search his person or vehicle and he agrees that any inventions he creates or patents he obtains while working at RAC will become the exclusive property of RAC. The agreement does not recite any consideration. In the confidentiality agreement, Miller promises not to disclose confidential information to anyone outside of RAC in consideration of payment of his salary. Miller also executed a compensation agreement that set forth his salary in terms of the amount he was to receive every two weeks. In addition, RTA's policy manual contains a ten-year pay scale.

This evidence does not unequivocally indicate RAC's or RTA's intent to be bound not to terminate Miller except under clearly specified circumstances. *See Brown*, 965 S.W.2d at 502. While the federal affirmative action program requires RAC and RTA to hire and advance Vietnam veterans, the program in no way limits an employer's ability to discharge employees at will, regardless of any Vietnam veteran status. *See* 38 U.S.C. § 4212(a)(1). RTA's policy manual specifically states that it is an at-will employer, and RTA "reserves the right to terminate employment for any reason at any time." The policy manual also expressly states that it does not constitute a contract. *See Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex.1993) ("A disclaimer in an employee handbook, such as the one included by Federal Express, negates any implication that a personnel procedures

manual places a restriction on the employment at will relationship.").

The other evidence cited by Miller, including the offer letter and employment agreements, also does not indicate any intent on the part of RAC or RTA to be bound not to terminate Miller except under clearly specified circumstances. *See Jones,* 92 S.W.3d at 487–88 (holding offer letter that contained statements of annual salary and general statement that salary is based on future performance did not create employment contract); *Brown,* 965 S.W.2d at 502 ("An employee who has no formal agreement with his employer cannot construct one out of indefinite comments, encouragements, or assurances."); *Rios v. Tex. Commerce Bancshares, Inc.,* 930 S.W.2d 809, 815 (Tex.App.-Corpus Christi 1996, writ denied) (holding letter offering employment was not contract because it merely stated salary and other benefits but did not set term of employment); *Massey v. Houston Baptist Univ.,* 902 S.W.2d 81, 83–84 (Tex.App.-Houston [1st Dist.] 1995, writ denied) (holding written employment contract did not alter at-will employment relationship because contract contained no term limiting employer's ability to terminate employee at will); *Lee–Wright, Inc. v. Hall,* 840 S.W.2d 572, 578 (Tex.App.-Houston [1st Dist.] 1992, no writ) (holding at-will status of employment relationship altered by agreement to employ plaintiff for specific number of years). Miller failed to produce more than a scintilla of evidence that he had an employment contract with RAC or RTA. *See Jackson,* 979 S.W.2d at 70–71. The trial court therefore properly granted RAC and RTA's summary judgment on Miller's breach of contract claims.

*B. FOC's Summary Judgment*

█ In its traditional motion for summary judgment, FOC contends that it established as a matter of law that no employment contract existed between itself and Miller that would limit its ability to terminate Miller's employment at will. Miller contends that in addition to the evidence cited above, the following evidence establishes an employment contract between himself and FOC.

The combination agreement between FOI and RTA provides:

At the Effective Time, except as specifically provided below in this Section 6.2, [FOC] hereby agrees to assume, and agrees to pay, perform and discharge when due, all obligations and liabilities for compensation and employee benefits, and all other liabilities which are attributable to [FOI's] or [RTA's] employment of any employee, agent or independent contractor prior to the Effective Time without regard to whether such obligations or liabilities arose prior to or subsequent to the Effective Time.

In December 2001, RTA's president, Gary Hart, wrote to RTA's pilots to announce that all pilots would be offered the opportunity to continue flying for FOC. A few weeks later, Miller received a letter from Kenneth Ricci, Chairman and CEO of FOI. The letter stated, "all pilot positions will be retained and all pilots will be assured of their current flying positions and seniority" at FOC. The letter also contained a comparison between Miller's salary at RTA and his new salary at FOC. Miller received a letter offering him employment at FOC in February of 2002. He accepted the offer by signing at the bottom of the letter, as requested by FOC.

While FOC expressly agreed to assume the contractual obligations of RTA in the combination agreement, this did not create an employment contract between Miller and FOC. As we determined above, Miller did not have an employment contract with RAC and RTA; thus, there was no con-

tract for FOC to assume. *See Brown,* 965 S.W.2d at 502.

The letters Miller received from FOC executives also do not indicate FOC's intent to be bound not to terminate Miller except under clearly specified circumstances. *See id.* None of Miller's employment documents guarantees him a minimum term of employment, or otherwise limits FOC's ability to terminate his employment at will. *See Jones,* 92 S.W.3d at 487–88 (holding offer letter that contained statements of annual salary and general statement that salary is based on future performance did not create employment contract); *Brown,* 965 S.W.2d at 502 ("An employee who has no formal agreement with his employer cannot construct one out of indefinite comments, encouragements, or assurances."); *Travel Masters, Inc. v. Star Tours, Inc.,* 827 S.W.2d 830, 832–33 n. 2 (Tex.1991) (noting mere fact that employee was paid on monthly basis, without any other evidence, failed to establish that she was not at-will employee); *Rios,* 930 S.W.2d at 815 (holding letter offering employment was not contract because it merely stated salary and other benefits but did not set term of employment); *Massey,* 902 S.W.2d at 83–84 (holding written employment contract did not alter at-will employment relationship because contract contained no term limiting employer's ability to terminate employee at will); *Hall,* 840 S.W.2d at 578 (holding at-will status of employment relationship altered by agreement to employ plaintiff for specific number of years); *Ryan v. Superior Oil Co.,* 813 S.W.2d 594, 595–96 (Tex.App.-Houston [14th Dist.] 1991, writ denied) (holding letters written to employees before merger concerning plan for retaining employees after transition do not form employment contract).

Like the RTA policy manual, the FOC policy and procedures manual provides that all employees at FOC are employed on an "at will" basis, and expressly states that it does not constitute a contract. *See Matagorda County Hosp. Dist. v. Burwell,* 189 S.W.3d 738, 739–40 (Tex.2006) (holding employer's manual stating that employee "may" be dismissed for cause did not modify at-will employment by requiring that dismissal be only for cause); *Dutschmann,* 846 S.W.2d at 283 ("A disclaimer in an employee handbook, such as the one included by Federal Express, negates any implication that a personnel procedures manual places a restriction on the employment at will relationship."). Sullivan's affidavit also states that Miller's employment at FOC was at will, and that FOC never offered Miller an employment contract.

FOC introduced evidence affirmatively establishing that it employed Miller at will. Accordingly, we hold that FOC has established as a matter of law that Miller's employment at FOC was at will. *See Brown,* 965 S.W.2d at 502 (holding employment is presumed to be at will absent specific contrary agreement). The trial court's summary judgment in favor of FOC on Miller's breach of contract claim was thus proper.

### Common Law Claims

In his fifth issue, Miller contends the trial court erred in granting summary judgment on his common law claims.

*A. Promissory Estoppel*

██ Miller contends the trial court erred in granting summary judgment on his promissory estoppel claims. RAC, RTA, and FOC respond that Miller cannot maintain promissory estoppel claims in this case because there was no detrimental reliance as a matter of law.

██ The elements of a promissory estoppel claim are: (1) a promise, (2) foreseeability of reliance thereon by the promi-

sor, and (3) substantial reliance by the promisee to his detriment. *English v. Fischer*, 660 S.W.2d 521, 524 (Tex.1983). Miller relies upon *Roberts v. Geosource Drilling Services, Inc.*, in which the employer, Geosource, promised Roberts employment, inducing him to quit his former job. 757 S.W.2d 48, 49 (Tex.App.-Houston [1st Dist.] 1988, no writ). This court held that Roberts could maintain a promissory estoppel claim even through Roberts and Geosource had expressly contracted that the employment would be at will.[7] *Id.* at 50. We stated, "[i]t is no answer that the parties' written contract was for an employment-at-will, where the employer foreseeably and intentionally induces the prospective employee to materially change his position to his expense and detriment, and then repudiates its obligations before the written contract begins to operate." *Id.*

Miller's promissory estoppel claims fail as a matter of law because Miller did not rely on any promise to his detriment. The evidence in this case that FOC hired Miller in early 2002 is undisputed, albeit for a short time. Moreover, Miller was not induced to leave his former job—rather, that position was eliminated incident to the creation of FOC. FOC did not promise to retain Miller for any length of time. Thus, even under *Roberts*, there could be no detrimental reliance in this case as a matter of law.[8] *See English*, 660 S.W.2d at 524; *Roberts*, 757 S.W.2d at 50–51. We therefore hold that the trial court properly granted summary judgment on Miller's promissory estoppel claims.

### B. Negligent Misrepresentation

 Miller contends the trial court erred in granting summary judgment on his negligent misrepresentation claims. RAC, RTA, and FOC respond that the statements Miller complains of constitute promises of future conduct rather than statements of existing fact and are therefore not actionable.

 The elements of a negligent misrepresentation claim are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n. 24 (Tex.2002); *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex.1999); *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991). To establish a negligent misrepresentation claim, the plaintiff must also prove that the defendant misrepresented an existing fact rather than a promise of future conduct. *See Sloane*, 825 S.W.2d at 442; *Dallas Firefighters Ass'n v. Booth Research Group, Inc.*, 156 S.W.3d 188, 194 (Tex.

---

**7.** The Fourteenth Court of Appeals has held that "[a] promise to provide employment which is subject to termination at any time or for any reason does not provide any assurances about the employer's future conduct, and does not provide a basis for detrimental reliance as a matter of law." *Collins v. Allied Pharmacy Mgmt., Inc.*, 871 S.W.2d 929, 937 (Tex.App.-Houston [14th Dist.] 1994, no writ).

**8.** In *Collins*, the Fourteenth Court of Appeals noted the absurdity of this result: "[W]e believe *Roberts* abrogates the employment at will doctrine in all cases where the employee must quit an existing job to accept a new offer of employment. Also, we find it would be illogical to hold that an employee has no remedy if he is fired one week after commencing work, but may recover damages if the employer refuses to allow him to commence work at all." 871 S.W.2d at 937.

App.-Dallas 2005, pet. denied); *Swank v. Sverdlin*, 121 S.W.3d 785, 802 (Tex.App.-Houston [1st Dist.] 2003, pet. denied); *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex.App.-Houston [14th Dist.] 1999, pet. denied).

Miller bases his negligent misrepresentation claims on two specific statements. In December 2001, RTA's president, Gary Hart, wrote to RTA's pilots to announce that all pilots would be offered the opportunity to continue flying for FOC. A few weeks later, Kenneth Ricci, Chairman and CEO of FOI, sent a letter to Miller, stating that "all pilot positions will be retained and all pilots will be assured of their current flying positions and seniority" at FOC. Miller asserts that these statements were false because the master transaction agreement creating FOC provides:

> 4.5 <u>Employees</u>. Prior to the Closing Date, the Parties will identify the employees of [FOI] and [RTA] that are to be offered employment with [FOC] as of the Closing Date and shall make a formal offer of employment to each such Person and shall inform each such Person of the compensation and benefits for which such Person will be eligible as an employee of [FOC].

Miller's negligent misrepresentation claims fail as a matter of law because the statements made by Hart and Ricci were promises of future conduct rather than statements of existing fact. *See Dallas Fire Fighters Ass'n*, 156 S.W.3d at 195 (holding statements about movement of ranks consisted of expectation of future conduct, not existing fact, and were not actionable); *Swank*, 121 S.W.3d at 802–03 (holding oral promises not to fire plaintiff, not to take control of AMPS, and not to exercise stock options were promises of future conduct, not existing fact); *Holt*, 987 S.W.2d at 141 (holding representations defendant would provide all equipment necessary to start Louisiana plant and would pay plaintiff $55,000 annually were promises of future conduct and not misrepresentations of existing fact); *Miksch v. Exxon Corp.*, 979 S.W.2d 700, 706 (Tex. App.-Houston [14th Dist.] 1998, pet. denied) (holding alleged oral promise not to terminate plaintiff was not misrepresentation of existing fact but was promise to refrain from taking action in future). The trial court therefore properly granted summary judgment on Miller's negligent misrepresentation claims.[9]

### C. Fraud

Miller contends the trial court erred in granting summary judgment on his fraud claims. RAC, RTA, and FOC respond that Miller's fraud claims are barred because his employment was at will.

The elements of fraud are: (1) a material representation that was false when made; (2) when the representation was made, the speaker knew it was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the speaker made the representation with the intent that the other party should act upon it; (4) the party actually and

---

**9.** In his appellate brief, Miller also complains about additional negligent misrepresentations concerning flight releases RTA issued to its pilots. Miller did not plead these misrepresentations and the parties did not address them in their summary judgment motions. We cannot address these misrepresentations on appeal because they were not presented to the trial court. Tex.R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as ground for reversal."); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 675 (Tex.1979) (holding issues not expressly presented to trial court may not be considered on appeal as ground for reversal of summary judgment).

justifiably relied on the representation; and (5) thereby suffered injury. *Ernst Young, L.L.P. v. Pac. Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001). "For a promise of future performance to be the basis of actionable fraud, it must have been false at the time it was made." *Schindler v. Austwell Farmers Coop.,* 841 S.W.2d 853, 854 (Tex.1992).

Miller bases his fraud claims on the statements by Hart and Ricci promising that all RTA pilots would be offered positions at FOC. Miller believes these statements were false when they were made because the master transaction agreement seems to indicate that not all RTA pilots would be offered positions at FOC.

We have already determined that Miller's employment with RAC, RTA, and FOC was at will. *See Brown,* 965 S.W.2d at 502 (holding employment is presumed to be at will absent specific contrary agreement). This court has held that "[a]n 'at will' employee is barred from bringing a cause of action for fraud against his employer based upon the employer's decision to discharge the employee." *Leach v. Conoco, Inc.,* 892 S.W.2d 954, 961 (Tex.App.-Houston [1st Dist.] 1995, writ dism'd w.o.j.); *see also Brown v. Swett & Crawford of Tex., Inc.,* 178 S.W.3d 373, 379–80 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (holding status as at-will employee precludes claim for fraudulent inducement as matter of law). Miller's fraud claims based on the statements that FOC would hire all RTA pilots are therefore precluded as a matter of law because Miller's employment was at will. The trial court properly granted summary judgment on Miller's fraud claims.

### D. Civil Conspiracy

Miller contends the trial court erred in granting summary judgment on his civil conspiracy claims. FOC filed a traditional summary judgment motion on Miller's civil conspiracy claim, alleging that Miller's claim fails as a matter of law because it is not supported by an underlying tort. RAC and RTA filed a no-evidence summary judgment motion, alleging Miller had produced no evidence of a meeting of the minds.

 A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Firestone Steel Prods. Co. v. Barajas,* 927 S.W.2d 608, 614 (Tex.1996). The essential elements of a civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Tri v. J.T.T.,* 162 S.W.3d 552, 556 (Tex.2005); *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex. 1983). Independent liability for civil conspiracy does not exist. *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.,* 217 S.W.3d 653, 668 (Tex.App.-Houston [14th Dist.] 2006, no pet. h.). Civil conspiracy is considered a derivative tort because a defendant's liability depends upon its participation in some underlying tort for which the plaintiff seeks to hold the defendant liable. *Tilton v. Marshall,* 925 S.W.2d 672, 681 (Tex.1996). An actionable conspiracy must consist of acts that would have been actionable against the conspirators individually. *Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 581 (Tex. 1963). Thus, to prevail on a civil conspiracy claim, the plaintiff must show the defendant was liable for some underlying tort. *See Trammell Crow Co. No. 60 v. Harkinson,* 944 S.W.2d 631, 635 (Tex.1997); *Tilton,* 925 S.W.2d at 681.

Miller asserts that RAC, RTA, FOI, and FOC engaged in a civil conspiracy to wrongfully discharge pilots who refused to fly aircraft in violation of federal law. As

evidence of this conspiracy, Miller produced the affidavits of Rusty Wharton and Reinhardt Hanold, who testified that John Topliff informed them that he had been instructed by his superiors at RTA to identify for termination any pilots who would not operate aircraft that had been issued flight releases. Wharton and Hanold were both RTA pilots, and Topliff was RTA's fleet manager. Topliff also testified that executives at FOC pressured pilots to fly aircraft in violation of federal law as well. Additionally, Miller cites the master transaction agreement and the combination agreement, which suggest that some RTA pilots might not be offered employment at FOC.

As we determined above, the ADA preempts Miller's *Sabine Pilot* wrongful discharge claim against FOC. Miller's civil conspiracy claim against FOC therefore fails as a matter of law because Miller cannot assert a wrongful discharge claim against FOC under *Sabine Pilot.* A civil conspiracy claim against FOC will not lie unless evidence demonstrates that FOC participated in some underlying actionable conduct. *Tilton,* 925 S.W.2d at 681; *Ortiz v. Collins,* 203 S.W.3d 414, 422–23 (Tex. App.-Houston [14th Dist.] 2006, no pet.) (holding that where summary judgment was proper on underlying fraud claim due to lack of justifiable reliance, summary judgment was also proper on conspiracy to defraud claim); *RTLC AG Prods., Inc. v. Treatment Equip. Co.,* 195 S.W.3d 824, 833 (Tex.App.-Dallas 2006, no pet.) (holding plaintiff could not maintain civil conspiracy claim because it could not establish underlying tort).

Additionally, Miller produced no evidence that RAC and RTA had a meeting of the minds to perform an unlawful act necessary to establish his civil conspiracy claims. *See Alford v. Thornburg,* 113 S.W.3d 575, 588 (Tex.App.-Texarkana 2003, no pet.) (holding plaintiff produced no more than scintilla of evidence of meeting of minds); *Boales v. Brighton Builders, Inc.,* 29 S.W.3d 159, 164 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (holding plaintiff produced no more than scintilla of evidence of meeting of minds); *J. Parra e Hijos, S.A. de C.V. v. Barroso,* 960 S.W.2d 161, 170 (Tex.App.-Corpus Christi 1997, no pet.) (holding plaintiff produced no evidence of meeting of minds). The trial court therefore properly granted summary judgment on Miller's civil conspiracy claims.

## E. Negligence

Miller contends the trial court erred in granting summary judgment on his negligence claims. RAC, RTA, and FOC respond that an employer owes an at-will employee no duty of care in terminating his employment.

A negligence cause of action has three elements: (1) a legal duty owed by one person to another, (2) a breach of that duty, and (3) damages proximately caused by the breach. *D. Houston, Inc. v. Love,* 92 S.W.3d 450, 454 (Tex.2002). The threshold inquiry in a negligence case is duty. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). The Texas Supreme Court has held that an employer owes no duty of care in discharging an at-will employee. *See Tex. Farm Bureau Mut. Ins. Cos. v. Sears,* 84 S.W.3d 604, 609 (Tex.2002). The court stated:

> By definition, the employment-at-will doctrine does not require an employer to be reasonable, or even careful, in making its termination decisions. If the at-will doctrine allows an employer to discharge an employee for bad reasons without liability, surely an employer should not incur liability when its reasons for discharge are carelessly formed.

Engrafting a negligence exception on our at-will employment jurisprudence would inevitably swallow the rule. *Id.*

Miller contends that RAC, RTA, and FOC were negligent in terminating his employment. As we determined above, Miller's employment with RAC, RTA, and FOC was at will. *See Brown*, 965 S.W.2d at 502 (holding employment is presumed to be at will absent specific contrary agreement). RAC, RTA, and FOC therefore did not owe Miller a duty of care in terminating his employment. Miller's negligence claims fail as a matter of law. *See Wal–Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 740 (Tex.2003); *Sears*, 84 S.W.3d at 609. The trial court properly granted summary judgment on Miller's negligence claims.

*F. Intentional Infliction of Emotional Distress*

Miller contends the trial court erred in granting summary judgment on his intentional infliction of emotional distress claims. Miller maintains that he suffered severe emotional distress because he was required to pilot aircraft that were not safe to fly, and because he did not know whether RTA's aircraft contained latent mechanical defects due to other pilots having concealed such defects at the request of RAC and RTA.

The elements of intentional infliction of emotional distress are: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress that the plaintiff suffered was severe. *City of Midland v. O'Bryant*, 18 S.W.3d 209, 216 (Tex.2000). To be considered extreme and outrageous, conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and

to be regarded as atrocious and utterly intolerable in a civilized community. *Id.* at 217. "[A] claim for intentional infliction of emotional distress does not lie for ordinary employment disputes." *GTE SW., Inc. v. Bruce*, 998 S.W.2d 605, 612–13 (Tex.1999). The mere fact of termination of employment, even if the termination is wrongful, is not legally sufficient evidence that the employer's conduct was extreme and outrageous. *SW. Bell Mobile Sys., Inc. v. Franco*, 971 S.W.2d 52, 54 (Tex.1998).

The evidence Miller produced demonstrates that he suffered emotional distress because FOC terminated his employment and he was required to search for a new job. Even if FOC wrongfully terminated Miller, this fact alone would not support a claim for intentional infliction of emotional distress. *See id.* ("However, the mere fact of termination of employment, even if the termination is wrongful, is not legally sufficient evidence that the employer's conduct was extreme and outrageous under the rigorous standard that we established in *Twyman*."). The trial court therefore properly granted summary judgment on Miller's intentional infliction of emotion distress claims.

*G. Wage and Hour Claims*

Miller contends the trial court erred in granting RAC and RTA's motion for summary judgment on his wage and hour claims. Miller maintains that RAC and RTA only paid him for six weeks of accrued vacation time even though he was entitled to eight weeks' pay. Miller asserts that RTA is liable for these two weeks of vacation pay because RTA owns a controlling interest in FOC. In their traditional motion for summary judgment, RAC and RTA assert that they are not liable for these wages as a matter of law because they transferred their liability for Miller's wage and hour claims to FOC.

In his affidavit, William Wallisch states:

In connection with the creation of Flight Options, L.L.C., Travel Air and Flight Options, Inc. agreed that Flight Options, L.L.C. would assume any and all liabilities related to any vacation time that had been accrued by Travel Air pilots, including Plaintiff, prior to the this [sic] transaction.

An examination of the combination agreement confirms Wallisch's statements.

This undisputed evidence establishes as a matter of law that RAC and RTA transferred their liability for Miller's wages to FOC. *See* Tex.R. Civ. P. 166a(c); *KPMG Peat Marwick*, 988 S.W.2d at 748. The only evidence Miller cites in support of his wage and hour claims against RAC and RTA is Wallisch's testimony that RTA owns a controlling interest in FOC. The fact that RTA now owns a controlling interest in FOC does not make it liable for these wages. FOC is organized as a Delaware limited liability company and under Delaware law, the members of an L.L.C. are generally not liable for the obligations of the L.L.C., absent a showing that the court should pierce the corporate veil. *See* Del.Code Ann. tit. 6, § 18–303(a) (2005); *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 987–89 (Del.Ch.1987). The trial court therefore properly granted summary judgment on Miller's wage and hour claims against RAC and RTA.

### Conclusion

We hold that (1) the trial court did not abuse its discretion in refusing to strike William Wallisch's affidavit, (2) RAC and RTA established that they terminated Miller's employment for a reason other than his refusal to perform illegal acts, negating the causation required for a *Sabine Pilot* claim as a matter of law, (3) the Airline Deregulation Act of 1978 preempts Miller's *Sabine Pilot* wrongful discharge claim against FOC, and (4) the trial court prop-erly granted summary judgment on Miller's breach of contract and common law claims. We therefore affirm the trial court's orders granting summary judgment.