**EBASCO CONSTRUCTORS, INC., Appellant,**

v.

**John C. REX, Appellee.**

**No. 13–94–033–CV.**

Court of Appeals of Texas, Corpus Christi.

April 4, 1996.

Rehearing Overruled May 30, 1996.

William Book, Raymond Matthews, Dimitri Zgourides, Houston, for appellant.

Billie Pirner Garde, Hardy & Johns, Houston, for appellee.

Before DORSEY, ONION[1], and TED M. AKIN[2], JJ.

## OPINION

DORSEY, Justice.

This is a wrongful discharge case in which the jury found in favor of appellee, John Rex. By two points of error, appellant, Ebasco Constructors Inc., challenges the legal sufficiency of the evidence to support a jury finding and the admission of certain testimonial evidence. We affirm.

In January 1986, John Rex worked as a craft supervisor in the Heating, Ventilating, and Air Conditioning (HVAC) Department of Ebasco Constructors at the South Texas Nuclear Project under the supervision of William Rester. The project is owned by Houston Lighting and Power Company (HL & P). Licensing and regulation of nuclear facilities and materials fall under the aegis of the Nuclear Regulatory Commission (NRC).

Rex claimed that Rester and other personnel at Ebasco were involved in a conspiracy and criminal activities while working at the project. Some of the criminal activities included theft, fraud, and violations of state and federal regulations relating to the construction of nuclear power plants. One of Rex's allegations was that Rester and other Ebasco employees failed to obtain the proper inspections and follow the proper procedures and regulations during installation of the HVAC system. In late May or early June 1986, Rex related that Rester ordered him to complete one of the bays of the generator building within 24 hours. Rex responded that the job could not be done that quickly without going through hold points and bypassing the many required installation inspections, which amounted to violating procedures and regulations. Rex and his crew completed the installation over the weekend.

Rex also noticed discrepancies in the records wherein man hours were charged before work had even started and thousands of pounds of duct work were claimed but not yet installed. In a meeting in May 1986, Rester told the craft supervisors that, when filling out time sheets, to leave blank the number of hours each crew member worked. The time sheets would only show a listing of the work done, and Rester would then assign the work hours to the corresponding work codes. Rex refused to participate in any conspiracy to perform illegal acts and reported his suspicions to his superiors. One such memorandum regarding the unusually high number of man hours that were prematurely charged was sent to Don Dismuke in May 1986.

On August 18, 1986, Rester received a letter purportedly from Dismuke concerning Rex's negative performance and the recommendation that he be transferred "somewhere else besides the HVAC discipline." Dismuke denies authorizing or signing the letter because he did not agree with the negative comments concerning Rex. That same day, Rester removed Rex from his position as craft supervisor and assigned him the responsibility of monitoring housekeeping activities for HVAC commodities. Rex described his new assignment as a "do nothing" position.

On September 11, while Rex was on vacation, Rester and Dismuke compiled a reduction of force evaluation of all HVAC craft supervisors. As a result, Rester recommended Rex for termination based on the

---

1. Assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to Tex. Gov't Code Ann. § 74.003 (1988).

2. Assigned to this Court by the Chief Justice of the Texas Supreme Court pursuant to Tex.Gov't Code Ann. § 74.003 (1988).

reduction of force evaluation and his recent poor attitude. Rex's termination took effect on September 12, and Ebasco issued a letter notifying Rex of his termination on September 15.

Rex sued Rester, Donald White, Robert Marshall, and Ebasco alleging negligent and intentional infliction of emotional distress, tortious interference with a business contract, and wrongful termination. The trial court granted directed verdicts in favor of all defendants and dismissed all of the causes of action except for the wrongful termination claim against Ebasco. The jury found in favor of Rex and awarded him past damages of $150,000. By two points of error, Ebasco appeals from this judgment.

■■■ By its first point, Ebasco contends that there was no evidence to support the jury's finding that Rex was terminated for the sole reason that he refused to perform an illegal act. When we review a "no evidence" or legal sufficiency of the evidence challenge, we must consider only the evidence and inferences that support the jury's findings and disregard all evidence and inferences to the contrary. *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992); *Southern States Transp., Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989). If the findings are supported by probative evidence, then we must overrule the point and the uphold the finding. *Southern States Transp.,* 774 S.W.2d at 640. However, "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

■■■ Rex alleged that he was wrongfully terminated from his job with Ebasco for refusing to participate in criminal activities in connection with the construction of the nuclear power plant. Generally, employment for an indefinite term may be terminated at will and without cause. *East Line & R.R.R. Co. v. Scott,* 72 Tex. 70, 75, 10 S.W. 99, 102 (1888). Exceptions to the employment-at-

will doctrine have been statutorily created. *See, e.g.,* TEX.LAB.CODE ANN. § 451.001 (Vernon Pamphlet 1996) (discharge for filing a workers' compensation claim); TEX.CIV.PRAC. & REM.CODE ANN. § 122.001 (Vernon 1986) (discharge because of jury service).

■■ However, in 1985 the supreme court created a non-statutory exception to the employment-at-will doctrine in *Sabine Pilot Serv., Inc. v. Hauck,* 687 S.W.2d 733, 735 (Tex.1985). The court held that public policy, as expressed in the laws of Texas and the United States which carry criminal penalties, requires a very narrow exception to the employment-at-will doctrine. *Id.* The narrow exception covers only the discharge of an employee for the sole reason that the employee refused to perform an illegal act. *Id.* This Court followed and extended *Sabine Pilot* and held that the *Sabine Pilot* exception prohibits the discharge of an employee who in good faith attempts to determine whether the act her employer requested her to perform is illegal. *Johnston v. Del Mar Distrib. Co., Inc.,* 776 S.W.2d 768, 771 (Tex. App.—Corpus Christi 1989, writ denied). Public policy demands that an employee be allowed to investigate into whether such actions are legal so that an employee can determine whether or not to perform the act. *Id.*

Here, based on its finding that Rester was engaged in a criminal conspiracy with others at the time Rex was terminated, the jury found that Rex was terminated for the sole reason that he refused to participate in a criminal conspiracy with Rester. Ebasco argues that no direct evidence supports the existence of a conspiracy, that Rex was never asked by Ebasco to claim work that had not been performed, or that he refused to verify falsified documents. Ebasco further contends that even if Rex had refused to verify the false poundage reports, the reports were used for in-house purposes only and not used to report progress to HL & P or the NRC.[3] Thus, Ebasco concludes that falsification of poundage reports violated no federal statutes, and therefore, Rex was not asked to do an illegal act.

Criminal conspiracy is defined as follows:

---

**3.** To track Ebasco's progress, HL & P uses a computer system called the Material Labor and

Costs System (MLCS), which in turn was used to report to the NRC.

(a) A person commits criminal conspiracy if, with intent that a felony be committed:

(1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and

(2) he or one or more of them performs an overt act in pursuance of the agreement.

(b) An agreement constituting a conspiracy may be inferred from acts of the parties.

TEX.PENAL CODE ANN. § 15.02 (Vernon 1994).

A federal criminal statute states that

[w]hoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1001 (Supp.1995). The Code of Federal Regulations also contains the following language:

Section 223 [of the Atomic Energy Act] provides that criminal penalties may be imposed on certain individuals employed by firms constructing or supplying basic components of any utilization facility if the individual knowingly and willfully violates NRC requirements such that a basic component could be significantly impaired. Section 235 provides that criminal penalties may be imposed on persons who interfere with inspectors.

10 C.F.R. pt. 2, app. C at 138 (1995).

To prove the existence of a conspiracy, Rex produced evidence of work reported as complete before it was completed, evidence of work performed without following proper procedures, and evidence of falsification of documents. First, Rex produced reports showing pounds of duct work completed before they were installed and man hours charged before any work was done. Mike Holman testified that he heard Rester direct Dennis Wood, one of his subordinates, to claim a quantity of uninstalled sheet metal as installed. Although Holman asked him not to do so, Wood responded that he took his orders from Rester. Raymond Combs also testified that when he went to report the installation of several pieces of duct work, he found that the pieces had already been claimed. The claim reports were signed by a man named Dimaggio whose department was responsible for reporting poundage claimed to HL & P.

Second, as to not following proper procedures, Mike Holman testified that he heard Rester direct his subordinates to violate project rules and procedures and to run through hold points. Hold points are points during construction when the worker must wait for inspection and approval by an engineer or quality control inspector before proceeding. Holman further stated that certain safety related welding on critical hangers did not have the proper stamp to indicate that the welder had received specific training for this procedure and that the welding met safety standards. After Holman reported his finding, the coded stamps later appeared on the welding, but the men who were assigned the particular coded stamps had not yet reported for work at that time.

Third, Rex presented the following evidence to establish a conspiracy to falsify documents. Kathy Shoenberg was a Central Filing System supervisor who was in charge of preparation of data reports concerning the installation of duct work. She testified that, in 1985, Rester told her to change the status on a progress report to show that a piece of uninstalled duct was installed. Patricia Zgaby's testimony was similar to that of Shoenberg's. Zgaby worked under Rester and her duties included marking up layout drawings to show the placement of ducts in the unit and which sections were completed and which sections remain to be completed. She testified that at Rester's direction, she prepared some drawings which showed that work was completed when it was not. Furthermore, Linda Rester Gober, Rester's ex-wife who was familiar with HVAC documents from her prior experience working for Ebas-

co at other nuclear plants, testified that Rester forced her to forge signatures of supervisors and quality control inspectors on HVAC documents and poundage reports so that they may be deemed complete. Raymond Martin, a former foreman in the HVAC Department whose duties included reporting how much weight was installed during a week, stated that he found work approved by a quality control inspector when the work had not been completed. Martin further testified that the documents contained a signature and stamp of a quality control inspector who had ceased working at the project one year before the date shown on the documents. According to Martin, Rester had a quality control stamp on his desk even though he was not supposed to have one.

■ We conclude that Rex produced some evidence that a criminal conspiracy existed at Ebasco. Thus, Ebasco's claim of legal insufficiency relating to the existence of a criminal conspiracy is meritless.

We now determine whether there is some evidence to show that Rex was asked to claim work that had not been completed and that he refused to verify falsified documents. Many witnesses testified that reports were submitted which claimed man hours and pounds of duct work before any work or installation even started. Rex, a craft supervisor, stated that these quantity reports reflecting work performance had to be completed and signed by the craft supervisors each week. Thus, Rex had a duty to verify that the information contained in the reports were accurate. Falsified quantity reports are safety related concerns which fall under the auspices of the NRC. Therefore, signing reports which Rex knew were falsified would have meant that he, too, was falsifying documents, which is a criminal violation under United States Code § 1001. Moreover, signing and submitting the inaccurate documents knowing they were false also constitute a violation of § 1001's prohibition against concealing or covering up material facts.

Ebasco argues that it never asked Rex to commit any illegal acts. However, its argument is belied by the fact that Rex was asked to perform an illegal act since signing off on the reports was part of his duties as a craft supervisor. *See United States v. Mattox,* 689 F.2d 531, 533 (5th Cir.1982) (in a case concerning the application of § 1001 to a defendant who had a duty to supply information on government forms, the court held that "[s]ilence may be falsity when it misleads, particularly if there is a duty to speak").

■ Ebasco further argues that the quantity reports were only used in-house to track its own progress and were not submitted to the NRC. Consequently, Ebasco opines that since the reports were not used to report progress to the NRC, there can be no violation of any federal statutes. Nevertheless, Rex testified that Ebasco also asked him to submit false quantity reports to the MLCS which is a system used to report progress to the NRC. Additionally, there was testimony that the in-house reports were a source from which the MLCS data originated. The false statements do not have to be directly submitted to the NRC in order to violate § 1001. *United States v. Montemayor,* 712 F.2d 104, 108 (5th Cir.1983) (defendant's false statements made to Texas agency to obtain false birth certificates fell within § 1001's proscription against making false statements "in any matter within jurisdiction of any department or agency of the United States"); *United States v. Baker,* 626 F.2d 512, 514 (5th Cir.1980) (false time sheets claiming pay for hours not actually worked, which were submitted to federally-funded Dallas Housing Authority, sufficient to sustain § 1001 conviction because it is well settled law that false statements need not be made directly to federal agency); *United States v. Stanford,* 589 F.2d 285, 297 (7th Cir.1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979) (statement may concern a matter within the federal jurisdiction described in this section pertaining to the making of false statements to a federal agency, even if the statement is not submitted directly to the federal department or agency involved); *United States v. Sprecher,* 783 F.Supp. 133, 157 (S.D.N.Y.1992) (statute criminalizing false statement within jurisdiction of any department or agency of the U.S. does not require showing that statement was actually submitted to U.S. department or agency; it only requires that it was contemplated that

statement was to be utilized in matter within jurisdiction of department or agency). Hence, even if the false quantity reports are used for in-house purposes only and not directly submitted to the NRC, the false reports still fall under the proscription of § 1001.

■ Rex refused to falsify the reports and informed his superiors of his suspicions. Linda Gober testified that Rester became obsessed with Rex because "Rex wouldn't play his game and [Rester] would make him pay for it." After a few months, Rex was removed from his position as craft supervisor and assigned housekeeping duties. Ultimately, Rex received notice of his termination purportedly stemming from Ebasco's reduction in force. Thomas Jones, a safe-team investigator, stated in his report that Ebasco's actions between July and September 1986 "appear to be acts of retaliation against [Rex]." We conclude that there is some evidence to support the jury's finding that the sole reason for Rex's termination was because he refused to perform an illegal act. Accordingly, we overrule appellant's point one.

By its second point, Ebasco objects to the trial court's admission of certain evidence as irrelevant and immaterial to Rex's wrongful termination claim. Specifically, Ebasco objects to the evidence regarding theft, Rester's operation of a catering business, and Rester's use of company time and materials for personal profit.

■ To obtain reversal of a judgment based on error in the admission or exclusion of evidence, the party seeking review must show that the trial court's ruling was in error and that the error was calculated to cause and probably did cause rendition of an improper judgment. Tex.R.App.P. 81(b)(1); Tex.R.Civ.Evid. 103. Reversible error does not usually occur in connection with rulings on questions of evidence unless the complaining party can demonstrate that the whole case turns on the particular evidence admitted or excluded. *Service Lloyds Ins. Co. v. Martin,* 855 S.W.2d 816, 822 (Tex.App.—Dallas 1993, no writ); *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 837 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.);

*Atlantic Mut. Ins. Co. v. Middleman,* 661 S.W.2d 182, 185 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.).

Before evidence is admissible, it must be relevant. Tex.R.Civ.Evid. 402. In order to be relevant, the evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R.Civ. Evid. 401. Otherwise admissible evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. Tex.R.Civ.Evid. 403.

■ Ebasco objected to the admission of the following evidence as irrelevant and immaterial: 1) theft of company supplies and materials and 2) use of company materials and personnel to operate a catering business for personal profit. Ebasco argues that the evidence is irrelevant because there is no connection between the evidence of theft and fraud and Rex's wrongful termination cause of action. Rex argues that the evidence is relevant to his claim of criminal conspiracy occurring at the plant.

Rex's cause of action is predicated on the narrow exception created by *Sabine Pilot* which prohibits the termination of an employee because of his refusal to commit an illegal act. Rex's pleading generally alleges that Ebasco terminated him because he refused to participate in a criminal conspiracy. However, at trial, Rex admitted that he was never asked to participate in any of the activities complained of here as irrelevant. Rex had knowledge of these activities from working at the site but he was never involved with them in any way. Although Ebasco never asked Rex to participate in these activities, we conclude that evidence of these activities is relevant to Rex's cause of action. These activities are indicative of the general unlawfulness occurring at the plant that involved Rester and other Ebasco employees. The evidence is relevant to Rex's claim that he was aware of a general conspiracy to engage in wrongful activities, and that Ebas-

co conspired to discharge him because he refused to cooperate and to participate in such activities. Because the trial court did not err in admitting evidence of theft and fraud, we overrule appellant's point two.

Having overruled all of appellant's points of error, we affirm the judgment of the trial court.

AKIN, Assigned J., not participating.