

# NUMBER 13-07-132-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**CINGULAR WIRELESS, L.L.C.,** **Appellant,**

**v.**

**KENNETH D. LEE, JR.,** **Appellee.**

---

### On appeal from the 404th District Court
### of Cameron County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Yañez, Garza, and Vela
### Memorandum Opinion by Justice Vela

This is an appeal from a judgment entered in favor of appellee, Kenneth D. Lee Jr.,

and against appellant Cingular Wireless, L.L.C. ("Cingular"), in a non jury trial concerning

the alleged wrongful termination of Lee's employment. The trial court issued findings of

fact and conclusion of law in support of its judgment of $1.6 million dollars. Cingular urges

seven issues on appeal, including challenges to the legal and factual sufficiency of the evidence, various errors in the damage award, error in allowing the admission of Lee's expert witness, and error in refusing to allow appellant a jury trial or an emergency continuance. We reverse and render.

I. BACKGROUND

A. **The Z-Page Litigation and the Alleged Request to Lie**

Ken Lee's employment with Cingular ended on November 15, 2002. Lee argues that he was fired from Cingular because he refused to lie in a deposition that occurred about eleven months earlier, on January 31, 2002, in related litigation involving Cingular and Z-Page Wireless Communication ("Z-Page"), a former Cingular agent. Conversely, Cingular argues that Lee was not fired solely for refusing to lie in a deposition; rather, Lee's position was eliminated as a result of a major national reorganization having nothing to do with his conduct at a deposition and, thereafter, he was either not selected for, or failed to apply for, other available positions.[1] Cingular also notes that Lee received poor evaluations before his departure for missing meetings, sleeping at meetings, and other unsatisfactory conduct. These allegations were contested by Lee and determined in Lee's favor in the trial court's findings of fact.

Lee worked for Cingular from July 11, 1988 to November 15, 2002. Initially, he worked for Southwestern Bell, Cingular's predecessor, as a director of operations for the Rio Grande Valley. In that position, he was responsible for all operations in the region and

---

[1]Cingular contends that Lee was never asked to lie in his deposition. However, the trial court found that he was. Cingular's primary argument under its first issue is that even if he was asked to lie, it was not the sole cause of his departure from Cingular and, pursuant to *Sabine Pilot v. Hauck*, 687 S.W.2d 733 (Tex. 1985), it had to be the sole cause of his firing in order for him to recover.

2

supervised over 200 employees. He reported to a regional director and vice president. From May 2000 to October 2000, Lee was the Director of External Distribution for Cingular. In October 2000, Lee was asked to focus primarily on Z-Page, the largest agent for Cingular in the Rio Grande Valley. In this position, Lee reported to Judy Allen, who, like Lee, held a director-level position. At this time, Judy Allen became the Director of Sales Operations for the Tropical Texas market. There was no evidence of any other incidence at Cingular where a director reported to another director.[2] From October 2000 until September 2002, Allen reported to Rob Forsyth, the vice president and general manager of the Greater Texas/South Texas Region. Lee did not directly report to Forsyth.

Beginning in April 2001, Lee's sole responsibility was to manage the relationship with Z-Page. He no longer had any employees directly reporting to him. Although Z-Page was Cingular's biggest agent in the Rio Grande Valley, there was trouble brewing between the two companies based upon a change in the compensation structure for agents. Lee notified both Allen and Forsyth in July 2001 that Miller, an owner and principal of Z-Page, had given him a draft contract for the proposed sale of Z-Page to a company called Sol Telecommunications. During a conference call among Forsyth, Allen and Lee, which was secretly taped by Lee, the three speculated that Sol Telecommunications might be related to VoiceStream, a competitor company. This was not good news for Cingular because it had invested large amounts of money in Z-Page. The severity of, and reasons for, their concern at this point was debated at trial and seriously contested. The trial court found that the three were very concerned about Z-Page being sold to a competitor.

---

[2]In fact, there was evidence that in November 2001, Allen proposed the elimination of Lee's director-level position based on budget constraints and the fact that Lee's main customer had left.

Shortly after this conversation, Forsyth contacted Greg Hogue, a former colleague, who was working for VoiceStream at the time. Forsyth's conversation with Hogue is at the crux of the issues that later arose. The evidence is undisputed that Hogue told Forsyth that he had not heard of any pending purchase of Z-Page. This conversation would later be important in ensuing litigation involving Z-Page and Cingular, because there was concern that it could be construed as interference with a competitor.[3] Forsyth and the others were concerned about a possible sale because Cingular had invested more than one million dollars into Z-Page's business. Forsyth, Allen and Lee were also concerned because no one could locate a written contract between Cingular and Z-Page that they believed had been previously signed by the parties.

Without notice to Cingular, Z-Page converted its stores from Cingular to Verizon over the weekend of September 15 and 16, 2001. On September 14, 2001, Z-Page also sued Cingular for tortious interference with its business relationships with a prospective buyer. ("the Z-Page litigation"). Forsyth was individually named in the Z-Page litigation on November 15, 2001. Forsyth, Allen and Lee were all deposed in the Z-Page litigation between January 16, 2002 and January 31, 2002.

After Cingular lost the Z-Page account, Lee's primary account, Lee became responsible for developing new agents in the Rio Grande Valley. He remained in that position until his employment ended in November 2002. The evidence showed that he brought one new agent aboard during this time.

---

[3]Z-Page later sued Cingular for tortious interference with business relations. This will be discussed later in the factual statement.

In November 2001, prior to Lee's deposition, Lee testified that he had a discussion with Forsyth at a Cingular planning meeting in San Antonio. Lee testified that Forsyth told him to forget that Forsyth had any knowledge of the draft Z-Page/Sol Communications contract and also to forget that Forsyth had spoken with Hogue about the contract.[4] Lee further stated Forsyth told him that if Lee refused to "get this deal done," he needed to know if Lee was "mobile" because he might have to "surplus" him.[5] Forsyth testified that he did not have a discussion with Lee about the depositions that were going to take place. In fact, Forsyth claimed that he had not even been individually sued at the time he saw Lee at the Cingular meetings in early November 2001. Further, Forsyth was not brought into the Z-Page litigation until November 15, 2001, which was after the alleged conversation between Lee and Forsyth occurred. Forsyth testified that he did not instruct, suggest or encourage Lee to lie in a deposition. Nevertheless, the trial court found as a fact that Forsyth's comment to Lee at the early November meeting "constituted a request to commit perjury, a criminal act under the laws of Texas."

Lee also testified that in January 2002, Robert Vitanza, Cingular's in-house counsel, told him that he would not be able to help him if he did not take the company position with regard to whether Forsyth had contacted a competitor. According to Lee, when he asked Vitanza if he was telling him that he had to lie in the deposition or he would lose his job, Vitanza told Lee that he knew "exactly what I mean[t]." On the other hand, Vitanza testified that there was no truth to Lee's allegations. He stated that he did not tell Lee to lie.

---

[4]The draft contract was not, in fact, a genuine offer.

[5]Surplus is similar to a layoff.

According to Vitanza, everyone knew about Forsyth's call to Hogue, including Z-Page. It was no secret. The trial court found as a fact that Vitanza specifically requested Lee to commit perjury.

Certain events happened after Z-Page left Cingular that troubled Lee. For instance, he was sent a "surplus" notice by Allen on February 20, 2002, shortly after his deposition. Allen told him that it had been sent by accident. In fact, Lee kept his job and was not discharged at that time. The trial court found as a fact that Allen had intentionally created the document after Lee refused to commit perjury and that she intended that he ultimately would be "surplussed." Thereafter, Lee intervened in the Z-Page litigation on December 23, 2003, alleging that Cingular discharged him for the sole reason that he refused to perform a criminal act, namely to lie in his first Z-Page deposition at the request of Forsyth and Vitanza.

## B. **Project Alliance**

In the late summer and fall of 2002, at the same time that the Z-Page litigation was going on, Cingular announced a major reorganization plan called Project Alliance. It was initiated by Cingular's corporate headquarters. As a result of changes made pursuant to Project Alliance, 164 Texas employees lost their jobs, including Lee. The trial court made no finding that Project Alliance was initiated, designed, or implemented because Lee refused to lie in a deposition. The evidence was uncontroverted that there was a major reorganization of Cingular at this particular time.

Project Alliance created an organization based on three sales channels: Retail Sales, Business Sales, and National Distribution. Director positions, like Lee's, were eliminated as part of Project Alliance. It was not alleged, nor did the trial court find, that

6

Cingular eliminated the director positions because Lee was asked to lie in a deposition, but refused. In fact, Lee testified that he had no reason to believe that there were any director positions available in the Project Alliance for someone in his position.

As part of Project Alliance, employees like Lee were considered for other positions within the organization. The employees were placed in "universes," which were employee groupings based upon current job duties, title, and geographic location. Human resources employees were responsible for placing employees into the correct "universe." Lee was placed into three "universes" by the human resources department. Neither Forsyth, Allen nor Cingular's attorneys made any decisions with regard to where Lee would be placed. Lee was not offered a position in any of the "universes" in which he was placed. Allen did have responsibility for rating Lee pursuant to the dictates of Project Alliance. She rated him unfavorably in August 2002, which contrasted with his more favorable 2001 rating. Lee argued that the poor 2002 rating was the result of Forsyth having ordered Allen to score him low in the ratings for the Project Alliance positions. The trial court found as a fact that his August 2002 rating was very low solely because he refused to commit perjury in the January 2002 deposition.

It is undisputed that Lee did not score well on the evaluations that Allen prepared solely for placement in Project Alliance. Lee testified that Forsyth made Allen lower his evaluations or that Forsyth lowered them himself. Both Allen and Forsyth vehemently denied Forsyth's involvement in lowering Lee's rating. The trial court resolved this factual dispute in favor of Lee, finding it "incredible" that Lee could have received an overall evaluation of "3.5" in March 2002, yet received only a rating of "2" when he was rated for Project Alliance in August 2002. It was undisputed that some of the factors included in the

7

ratings for Project Alliance were different from those used for regular evaluation purposes.

Through Project Alliance, employees who were not selected for a first-round position could apply for open positions outside the Project Alliance framework. The parties disputed whether Lee had applied for other positions. Lee testified that he told Judy Allen he wanted to be considered for an Indirect Account Executive position. Allen testified that Lee told her he was not willing to "take a step backward". The trial court found that Allen prevented Lee from applying for the indirect account executive position by falsely representing that he was not interested in that position.

After Lee was passed over for the second round of positions, he received a sixty-day notice informing him that if he did not obtain another position in the company by November 15, 2002, by applying for an open job, his employment would end. It is uncontroverted that Lee was not prevented from seeking other positions during the sixty day period. The trial court made no finding in this regard. Lee's employment ended on November 15, 2002. He was offered, but declined, a separation package.

After Lee intervened in the Z-Page litigation, the trial court severed Lee's claims from the Z-Page case. After a bench trial on Lee's claim, the trial court entered a judgment awarding Lee $1.6 million dollars in damages.

## II. STANDARD OF REVIEW

By its first issue, Cingular complains that the evidence is legally insufficient to support the trial court's finding that the sole reason for the ending of Lee's employment was his purported refusal to lie in his deposition. The trial court's findings of fact are subject to review for legal sufficiency under the same standard applicable to a "no evidence" challenge to a judgment based on a jury verdict. *See Cont'l Coffee Prods., Co.*

8

*v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). Under this standard, we must review all of the evidence and credit the evidence that supports the judgment if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Sw. Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 627 (Tex. 2004).

The trier of fact is the sole judge of witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *City of Keller,* 168 S.W.3d at 819. However, the trier of fact is not free to believe testimony that is conclusively negated by undisputed facts. *Id*. at 820. If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable fact finder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. *Sw. Bell Tel.,* 164 S.W.3d at 627 (quoting *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002)) (considering legal-sufficiency review of jury finding–malice–made upon clear and convincing evidence).

III. THE SABINE PILOT EXCEPTION

Texas follows the rule of at-will employment, under which employment for an indefinite term may be terminated at will and without cause. *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex. 1991). A Texas employer may fire an employee at will for good cause, bad cause, or no cause at all. *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998). In *Sabine Pilot Service, Inc. v. Hauck,* the

9

Texas Supreme Court recognized a very narrow exception to the employment-at-will doctrine: "That narrow exception covers only the discharge of an employee for the sole reason that the employee refused to perform an illegal act." 687 S.W.2d 733, 735 (Tex. 1985). The public policy behind the *Sabine Pilot* exception is to deter violations of criminal laws. *Id*.; *Ran Ken, Inc. v. Schlapper*, 963 S.W.2d 102, 106 (Tex. App.–Austin 1998, pet. denied).

Since *Sabine Pilot*, courts have continued to stress the narrowness of the exception. *Schlapper,* 963 S.W.2d*.* at 105. A plaintiff, desiring to establish the *Sabine Pilot* exception, has the burden to prove that his discharge was for the sole reason that he refused to perform an illegal act that he reasonably believed would subject him to criminal penalties. *See Sabine Pilot,* 687 S.W.2d at 735; *see also Tex. Dep't of Human Servs. v. Hinds,* 904 S.W.2d 629, 633 (Tex. 1995). In *Sabine Pilot*, the supreme court imposed a "very strict standard of causation." *Tex. Dept. of Human Servs. v. Hinds,* 904 S.W.2d 629, 633 (Tex. 1995); *see Sabine Pilot*, 687 S.W.2d at 735*.* If there is any other reason for the employee's discharge, he cannot meet his burden of proof under *Sabine Pilot,* even if the refusal to perform an illegal act was, in fact, one of the reasons for the discharge. *See White v. FCI USA, Inc.,* 319 F.3d 672, 676-7 (5th Cir. 2003); *Bell v. Specialty Packaging Prods.,* 925 F. Supp. 475, 477 (W.D. Tex. 1994).

The *Sabine Pilot* exception does not apply when the wrongful motivation is a producing cause rather than the sole reason for the discharge. *See Paul v. P.B.-K.B.B., Inc.*, 801 S.W.2d 229, 230 (Tex. App.–Houston [14th Dist.] 1990, writ denied); *see also Fitch v. Reliant Pharm., LLC*, No. Civ.A.4:04-CV-615-Y, 2006 WL 325759 at *3 (N.D. Tex.

10

2006) (granting a summary judgment because defendant introduced evidence showing multiple reasons to fire plaintiff and no evidence that the sole cause for the firing was the refusal to participate in an illegal program). An employer who discharges an employee both for refusal to commit an illegal act and for a legitimate reason is not liable for wrongful termination. *Tex. Dept. of Human Servs*., 904 S.W.2d at 633.

Most of the cases interpreting the *Sabine Pilot* exception have done so strictly. For instance, in *Bell v. Specialty Packaging Products*, the court held that the evidence was clear that at least one reason for the plaintiff's termination was a reduction in work force. *Id.* at 477. The *Bell* court, applying Texas law, summarily held that the *Sabine Pilot* claim failed because the plaintiff's alleged refusal to perform an illegal act was not the sole reason for her discharge. *Id.; see White v. FCI v. USA, Inc.,* 319 F.3d at 677 (holding that defendant's evidence of an ongoing reduction-in-force and financial difficulties was unrefuted and that plaintiff failed to make a prima facie case under *Sabine Pilot*); *see also Laird v. Lockheed Eng'g & Scis. Co.*, No. 01-98-01140-CV, 2001 WL 301438, at *4 (Tex. App.–Houston [1st Dist.] Mar. 29, 2001, no pet.) (not designated for publication) (holding that summary judgment was proper because the summary judgment evidence showed several factors contributed to the decision to terminate the plaintiff, including a cost reduction program and the fact the company was downsizing); *Enserch Exploration Inc. v. Thorne*, No. 11-98-00070-CV, 2000 WL 34234577, at *5 (Tex. App.–Eastland Jan. 13, 2000, no pet.) (not designated for publication) (reversing and rendering a jury verdict, holding that in addition to plaintiff failing to establish that he had refused to perform an illegal act, the evidence showed that plaintiff was discharged in a general reduction-in-force

11

four years after he claimed to have refused to perform an illegal act); *cf. Ebasco Constructors, Inc. v. Rex*, 923 S.W.2d 694, 700 (Tex. App.–Corpus Christi 1996, writ denied) (discussing that plaintiff's managers prepared a reduction in force evaluation in plaintiff's job category and immediately recommended him for discharge and concluding that there was some evidence to support finding of sole cause).

In *Miller v. Raytheon Aircraft Company*, the court upheld a summary judgment granted in favor of Raytheon on evidence that it had terminated all pilots, including the plaintiff, due to the creation of a new business and the cessation of another. *Miller*, 229 S.W.3d 358, 368 (Tex. App.–Houston [1st Dist.] 2007, no pet.); *cf. McClellan v. Ritz-Carlton Hotel Co.,* 961 S.W.2d 463, 464 (Tex. App.–Houston [1st Dist.] 1997, no pet.) (holding defendant failed as a matter of law to prove at least one legitimate reason for terminating plaintiff's employment).

## IV. ANALYSIS

Cingular argues that the trial court's judgment should be reversed because the *Sabine Pilot* exception does not apply, primarily for the reason that Lee failed to prove that he was discharged solely because he refused to lie in his disposition. Although almost each relevant fact was hotly contested with regard to the elements of a *Sabine Pilot* claim, we will assume, for purposes of our analysis of this issue only, that the evidence was sufficient to support Lee's claim that he was asked to perform an illegal act; namely that he was asked to lie in his deposition. However, Lee's burden of proof under this very narrow exception to the employment-at-will doctrine was to prove by a preponderance of the evidence that his refusal to lie in his deposition was the *sole* cause of departure from

12

Cingular.

The term "sole" is defined as "the one and only, single." Bryan A. Garner, A DICTIONARY OF MODERN USAGE, 816 (2nd ed. 1995). To prevail, Lee had to prove two things: (1) his refusal to lie in the deposition was the cause for his departure from Cingular, and (2) his discharge was for no other reason than his refusal to lie in his deposition. *Sabine Pilot*, 687 S.W.2d at 735. While the statement of law is clear, its application seems less so. For instance, in *Bell v. Specialty Packaging Products*, the trial court found that the Sabine Pilot claim failed because "it is clear from the facts that at least one reason for plaintiff's termination was the reduction in work force at the plant." *Id.* at 477. In *Bell*, the mere fact of another reason for discharge was enough to negate the plaintiff's claim. *Id.* Similarly, in *White*, the Fifth Circuit held that there was unrefuted evidence of an ongoing reduction-in-force and financial difficulties and affirmed a summary judgment, holding that the employee did not come within the *Sabine Pilot* exception of the employment-at-will doctrine under Texas law. 319 F.3d at 674. Likewise, in *Miller*, the court determined as a matter of law in a summary judgment proceeding that the employer established that it terminated the employee for a reason other than the employee's refusal to perform illegal acts. *Id.* at 367.

On the other hand, in *Morales v. SimuFlite Training Int'l, Inc.*, the Dallas Court of Appeals reversed a summary judgment that had been granted in the employer's favor, stating that there was more than a scintilla of evidence that genuine issues of material fact existed regarding whether Morales's refusal to sign a blank form was the sole reason for his termination. 132 S.W.2d 603, 609 (Tex. App.–Dallas 2004, pet denied). The *Morales*

court reasoned: "SimuFlite contends that even if there is evidence that Morales was fired for refusing to sign the FRF–which it denies–his refusal was not the sole cause for his termination. When juxtaposed, however, to Morales's testimony the alternative reasons merely raise a fact issue concerning the reason for his termination." *Id.* at 610. The *Morales* opinion, however, appears to disregard that the burden to show the sole reason for discharge is on the employee, not the employer. *See also Bowen v. E-Systems, Inc.*, No. 05-95-00821-CV, 1996 WL 499814 at *9 (Tex. App.–Dallas Aug. 29, 1996, writ denied) (not designated for publication) (holding that summary judgment in favor of employer should be reversed because a fact issue exists concerning whether employer discharged employee solely for refusing to change his disposition for rejection of circuit boards or panels at issue).

Here, the evidence was uncontroverted that Project Alliance eliminated both the job title and job function that Lee held in the organization. The position he had previously held no longer existed at Cingular. Lee agreed that there were no director positions available after Project Alliance was implemented. Cingular presented uncontroverted evidence of at least one other reason that explained Lee's separation from employment—namely, that his job no longer existed under Project Alliance. Lee urges that his ability to get other positions with Cingular after the reallocations made in Project Alliance occurred was made impossible or severely compromised because of the poor ratings he received from Allen and that those low ratings occurred solely because Lee refused to lie in a deposition. That is a different issue from the issue of whether he was fired solely because he refused to lie in his deposition.

14

Although Lee doesn't argue expansion of *Sabine Pilot*, what Lee asks this Court to do is either disregard unrefuted evidence of another cause for his separation from Cingular or extend the exception in *Sabine Pilot* to allow an employee to recover when an employer declines to place an employee in another position after a reorganization because the employee has previously refused to commit an illegal act. Under *City of Keller*, "undisputed contrary evidence becomes conclusive (and thus cannot be disregarded) when it concerns physical facts that cannot be denied." *City of Keller,* 168 S.W.3d at 815; *see also Augillard v. Madura,* 257 S.W.3d 494*,* 501 (Tex. App.–Austin 2008, no pet.)

Here, Lee does not challenge Cingular's decision to conduct Project Alliance, nor does he challenge or refute the elimination of his director-level title and function. He does not urge that he was placed in the incorrect "universes" for job placement in Project Alliance. He remained with Cingular for almost one year after his deposition took place. The elimination of his position as a result of Project Alliance was undisputedly one reason Lee did not keep his job. There was a restructuring and a reduction-in-force. Lee also did not apply for any positions outside Project Alliance.

The trial court was not free to disregard undisputed controverting evidence establishing that Lee's purported refusal to lie in his deposition was not the sole cause of his departure form Cingular. Further, based on the consistent refusal to expand the *Sabine Pilot* exception, we cannot do so here. *See, e.g., Fite v. Cherokee Water Co.,* 6 S.W.3d 337, 342 (Tex. App.–Texarkana 1999, no pet.) (refusing to expand *Sabine Pilot* to statutes that have no penalties); *Mayfield v. Lockheed Eng'g & Scis. Co.,* 970 S.W.2d 185 (Tex. App.–Houston [14th Dist.] 1989, pet. denied) (stating2 that there is no cause of action for

employees in the private sector who are terminated for reporting illegal activity).[6]   We

sustain issue one.

## V. Conclusion

Having determined that the trial court erred in disregarding uncontradicted evidence

that Lee's alleged refusal to lie in his deposition was not the sole cause for his leaving

Cingular, we reverse the judgment of the trial court and render judgment that the plaintiff

take nothing.


ROSE VELA
Justice


Memorandum Opinion delivered and
filed this 2nd day of April, 2009.

---

[6]We note that the *Sabine Pilot* exception to the employment-at-will doctrine is very narrowly applied and does not serve as a blanket prohibition on bad faith practices by employers in personnel decisions.  For example, under *Sabine Pilot* and its progeny, an employer may lawfully base a decision to terminate an employee predominantly on that employee's refusal to commit an illegal act, as long as there is *any* additional non-illegal reason that contributes to the decision to terminate.  Here, the court found as fact that "it became clear soon after Lee testified in his deposition that Allen intended that Lee ultimately be surplussed from [Cingular]."  Thus, Cingular may have formed the intent to terminate Lee based on his refusal to lie in deposition.  However, Cingular did not actually effectuate Lee's termination until Project Alliance was implemented.  Given the fact that over 100 employees were let go in Texas alone as a result of Project Alliance, it would have been extremely difficult for Lee to show that this reorganization was not a factor that contributed, in however small a part, to Cingular's decision to terminate him.  Therefore, even if Cingular intended to terminate Lee because of his failure to lie in deposition, Project Alliance gave Cingular the additional non-illegal reason for termination that is necessary under *Sabine Pilot* to avoid liability.